William G. MAGUIRE

v.

COMMISSIONER OF INTERNAL REVENUE.

No. 11218.

United States Court of Appeals Seventh Circuit.

May 19, 1955.

2.. See Leicht v. Commissioner of Internal Revenue, 8 Cir., 137 F.2d 433, 435, and authorities there cited.

Joseph J. Daniels, Indianapolis, Ind., Francis D. Higson, New York City, William P. Nottingham, Washington, D. C., Baker & Daniels, Indianapolis, Ind., Steptoe & Johnson, Washington, D. C., of counsel, for petitioner.

H. Brian Holland, Asst. Atty. Gen., Grant W. Wiprud, Atty., U. S. Dept. of Justice, Washington, D. C., Ellis N. Slack, Hilbert P. Zarky, Sp. Assts. to the Atty. Gen., for respondent.

Before MAJOR, FINNEGAN and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This is a petition for review of a decision of the tax court of the United States.[1] Involved is the income tax liability of petitioner (herein sometimes referred to as "taxpayer") for the year 1945. During that year, as well as before and since, taxpayer was and has been the owner of shares of stock of Missouri-Kansas Pipe Line Company (which, in this era of synthetic abbreviations, is referred to in this litigation as "Mokan").

The first question presented to us is whether certain corporate distributions by Mokan to taxpayer in 1945 were in part taxable dividends, or were amounts distributed in partial liquidation of Mokan under Section 115 of the Internal Revenue Code of 1939.[2] The tax court held that they were ordinary dividends, taxable as such. Taxpayer asserts that the decision should be reversed because said amounts received by taxpayer were distributed in partial liquidation of Mokan.

We now state the facts material to this appeal, which are set forth in a stipulation of facts and adopted by the tax court in its findings of fact.

1. 21 T.C. 853.    2. 26 U.S.C.A. § 115.

Mokan is a Delaware corporation operating on a calendar-year, accrual basis. It was organized in 1928 to engage in the business of producing, transporting and distributing natural gas. Shortly thereafter Panhandle Eastern Pipe Line Company (herein referred to as "Panhandle") was organized and became a wholly-owned subsidiary of Mokan. In 1929, through its subsidiary Panhandle, Mokan commenced construction of a pipeline from Texas to Indiana. As a means of financing this project, Mokan sold one-half of its Panhandle stock in 1930 and, in effect, pledged the other half in 1931. Through the pledge and the sale, Columbia Oil & Gasoline Corporation (referred to herein as "Columbia") eventually became the owner in 1932 of all of the Panhandle stock, Mokan having gone into receivership in that year. In 1936 the United States government procured the entry of a consent decree in an anti-trust suit, requiring Columbia to return to Mokan one-half of the Panhandle stock, and giving to Columbia and Mokan each rights to subscribe for 80,000 additional shares of Panhandle. Columbia exercised its rights, and as a result held 404,326 shares of Panhandle to 324,326 shares of Panhandle held by Mokan. Mokan, unlike Columbia, was required to distribute these rights to its stockholders.

Mokan's receivership ended in 1937 and, until 1943, Mokan tried to rid Panhandle of Columbia control.

In 1937, prior to release from receivership, at a meeting of Mokan stockholders the question of whether Mokan should be completely liquidated arose. The stockholders were divided on this issue, those favoring complete liquidation being represented by the Murphy committee, and those opposed being represented by the Maguire committee. The stockholders then elected directors backed by the Maguire committee.

On December 31, 1942, taxpayer as president of Mokan, wrote to its stockholders referring to management's policy of attempting to free Panhandle from control of Columbia, the principal objectives then being: (1) the acquisition by Panhandle of an extension to Detroit then wholly owned by Columbia; (2) cancellation of the voting power of 10,000 shares of class "B" 6% preferred stock, all owned by Columbia; (3) the retirement of 100,000 shares of class "A" 6% participating preferred stock, also owned by Columbia; and (4) the divestment of Columbia of its 50.1% common stock interest in Panhandle. The letter reported that the first three objectives had been accomplished, and also that on July 7, 1942, a new settlement was made by Columbia which, among other things, accomplished: (a) Columbia agreed to sell all its Panhandle common stock to Phillips Petroleum Company (herein referred to as "Phillips"), for the joint account of Phillips and Mokan, the letter indicating that Mokan would then own about 66% of Panhandle's common stock and Phillips would own about 25%, the balance being publicly held; and (b) all litigation between Mokan and Columbia would be terminated.

Under date of November 3, 1943 taxpayer, as president of Mokan, again wrote to its stockholders. Pertinent parts of his letter revealed that on March 31, 1943 Mokan's efforts culminated in a settlement contract under which it acquired 202,163 additional shares of Panhandle at a cost of $26.12 per share, giving it an ownership of about two-thirds of the total outstanding common stock of Panhandle; that the directors of Mokan on November 3, 1943 adopted a resolution reading:

"Whereas the principal objectives of the Missouri-Kansas Pipe Line Company have been accomplished; and

"Whereas giving due consideration and recognition to all existing facts, it is the consensus of the Board of Directors that appropiate steps should be taken to effect the orderly liquidation of Mokan and to guarantee the continued independent op-

eration of Panhandle Eastern Pipe Line Company.

"Now, Therefore, be it

"Resolved that a committee to consist of Messrs. Maguire, Letts and Main be and hereby is appointed to undertake a study of the most appropriate means of accomplishing these ends and report their recommendations to this Board as soon as possible, consistent with adequate consideration of the problems involved."

that management "will undertake compliance with this resolution with all diligence" and would endeavor to place the recommendations of the board of directors before the stockholders at the annual meeting.

A notice of an annual meeting of stockholders of Mokan to be held March 21, 1944 referred to and enclosed a copy of a plan set forth in resolutions adopted by the board of directors on February 14, 1944. This plan, in substance, provided, in the First part, that the directors should provide for the purchase by Mokan stockholders of shares of Panhandle stock held by Mokan within thirty days after the registration statement therein provided was filed by Panhandle with the Securities and Exchange Commission, such rights to purchase to be issued to the registered holders of Mokan stock, giving the right to purchase 1/10 share of common stock of Panhandle owned by Mokan at a price of $30 per share for (a) each share of common capital stock, or (b) every 20 shares of class "B" capital stock of Mokan owned by them; the plan provided, in the Second part, that upon payment in full of Mokan's secured debt, its board of directors should immediately take necessary steps to offer to its stockholders the right to exchange in kind their shares for substantially all the remaining shares of Panhandle then owned by Mokan, under the terms and conditions therein stated, any shares of Mokan so exchanged to be cancelled and revert to the status of authorized but unissued stock, the proper officers of Mokan thereupon to cause a certificate of reduction in the capital stock to be executed and filed with the state of Delaware.

The resolution provided for its submission to the stockholders at the March 21, 1944 meeting, and that upon its ratification and approval by the stockholders, the officers of Mokan were authorized to take certain steps therein set forth to carry the plan into effect.

At an adjourned stockholders meeting held on March 27, 1944 the plan was approved, after an amending resolution failed for want of a second. This amending resolution, if adopted, would have provided that the stockholders present in person recommended to the management "to withdraw the liquidation and dissolution plan known as the 'Mokan Plan'."

Later the Second part of the Mokan plan was extended from time to time for definite periods up to June 30, 1952, and then it was extended without limitation as to its expiration date, "subject to (a) the termination thereof at any time, by action of the stockholders or of the board of directors, at any meeting thereof called for the purpose and (b) the suspension thereof during any period or periods when it is not practicable to comply with the requirements of the Securities Act of 1933 applicable thereto."

In 1943 Mokan settled four litigated cases to which it was a party; two more cases in 1944; one in 1945; and in 1951 it settled the only remaining litigation to which it was a party.

In 1944 Mokan prepaid its secured debt of $5,050,000, sold its investment in Kentucky Natural Gas Corporation, and terminated by mutual agreement its contract with that corporation under which it had been rendering it certain technical services.

In 1943 Mokan had three full-time salaried officers and seven other full-time employees; in 1944 it had three salaried officers, one of whom was part-time, and six other employees, one of whom was part-time; in 1945 it had two salaried

officers, one of whom was part-time, and five other employees, one of whom was part-time; in 1946 it had two salaried officers, one of whom was part-time; in 1947, 1948, 1949 and 1950 it had two salaried officers, one of whom was part-time, and two other employees, both of whom were part-time; and in 1951 and 1952 it had two salaried officers, one of whom was part-time, and two other employees, one of whom was part-time. In 1945 Mokan gave up all of its office space except two rooms, one of which was used as an office and the other as a storage room for corporate records.

In 1949 Mokan, as a stockholder of Panhandle, received as a dividend one-half share of Hugoton Production Company stock for each share of Panhandle stock. A committee of directors appointed for the purpose of considering the effect of this dividend upon the Mokan plan recommended that the plan be amended so as to include two shares of Hugoton stock with each four shares of Panhandle stock. In the committee's report to the board of directors it was stated:

"* * * The Committee in making the foregoing recommendations, considered and took into account all of the assets of the Company as of the date of this report; but is of the opinion that such assets as exceed the number of shares of Panhandle Eastern Pipe Line Company and Hugoton Production Company recommended for inclusion in the Plan, should be held as a reserve against expenses of the Exchange Plan and against expenses of liquidation, in the event that sufficient number of stockholders should surrender their Mokan stock for exchange. Should the liquidation of the Company appear to be imminent, and the assests on hand exceed the amount of expenses and cost of the Exchange Plan and liquidation, then the stockholders can be protected by the sale of such Panhandle Eastern Pipe Line Company and Hugoton Production Company shares, and the distribution to stockholders in excess of the amount estimated to be required."

On January 1, 1944, there were outstanding 1,594,755 shares of the common stock of Mokan, and 847,006 shares of the corporation's class "B" stock. On December 31, 1952, there were outstanding 473,172 shares of Mokan's common stock, and 458,356 shares of its class "B" stock.

Comparative balance sheets of Mokan for December 31st of the years 1944 through 1952 show the percentage of liquidated assets as follows:

| | |
|---|---|
| 1944 | 51.42% |
| 1945 | 76.47% |
| 1946 | 81.29% |
| 1947 | 82.73% |
| 1948 | 84.79% |
| 1949 | 77.50% |
| 1950 | 78.73% |
| 1951 | 79.97% |
| 1952 | 80.41% |

In each of the years 1944 through 1952, inclusive, Mokan made cash distributions to its stockholders, the total thereof being $8,059,081.17.

On March 22, 1945 and again on December 27, 1949, the common stock of Panhandle was split two for one, and Mokan received the additional shares to which it was entitled. The holdings of Mokan in Panhandle stock on December 31, 1943 were 531,638 shares, or about 65% of the stock oustanding. Such holdings were 337,125 shares on December 31, 1944, or about 40% of the stock outstanding. Such holdings on December 31st of each of the years 1945 to 1952, were as follows:

| | |
|---|---|
| 1945 | 416,974 shares |
| 1946 | 349,923 |
| 1947 | 314,481 |
| 1948 | 269,432 |
| 1949 | 525,574 |
| 1950 | 501,020 |
| 1951 | 269,878 |
| 1952 | 467,271 |

The holdings of Mokan in Panhandle stock on December 31, 1952 represented about 12% of the outstanding stock.

The Commissioner contends that Mokan had substantial earnings or profits in 1945 which were exceeded by an accumulated deficit existing at the beginning of the year. During 1945, Mokan made distributions to stockholders totaling more than its earnings or profits during the year; and taxpayer, as a stockholder, shared in these distributions. The Commissioner contends that the distributions were taxable dividends under section 115(a) of the Internal Revenue Code of 1939 [3] to the extent of the earnings or profits during 1945, and that the amounts received by taxpayer are taxable accordingly. The tax court found that the distributions in question were not made in partial liquidation of the corporation under section 115(i).[4]

The Commissioner contends that the tax court finding is amply warranted by the record. He says that nowhere in the record does there appear any evidence of a final decision or settled purpose to liquidate the corporation, that the Mokan plan, adopted by the stockholders in 1944, does not contain or evidence such a decision or purpose; Mokan has not in fact been liquidated, although ten years have elapsed since adoption of the plan, and the facts of record fail to justify such a delay in keeping with a purpose to liquidate; that Mokan was thus not in process of complete liquidation in 1945; and since it is admitted that the distributions did not of themselves effect redemption or cancellation of stock, they were not made in partial liquidation under section 115(i). He adds that since the distributions were not liquidating distributions, they were taxable dividends to the extent of earnings or profits for 1945 under section 115(a).

Taxpayer contends, in part, that (1) distributions made by a corporation in liquidation are amounts distributed in partial liquidation within the meaning of section 115(c) and 115(i) although the liquidation was not completed in the year in which such distributions were made, and therefore the shareholders of the corporation who received such distributions are to treat the distributions as in part payment in exchange for their stock; (2) a corporation which has a manifest intention to liquidate, has ceased all business activities except those incidental to liquidation, and has proceeded with the liquidation of the corporate assets and with the cancellation or redemption of its stock, is in the process of liquidation, and distributions made, pursuant to such liquidation, are not dividends but are distributions in liquidation of the corporation within the purview of section 115(c) and section 115(i) of the Internal Revenue Code.

1. Section 115(a), (c) and (i) of the Revenue Act in force in 1945 [5] is, in part, as follows:

"(a) *Definition of dividend.* The term 'dividend' when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * * *"

"(c) *Distributions in liquidation.* Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under

3. 26 U.S.C.A. § 115(a).

4. 26 U.S.C.A. § 115(i).

5. 26 U.S.C.A. § 115(a) (c) (i).

section 111, but shall be recognized only to the extent provided in section 112. * * * "

"(i) *Definition of partial liquidation.* As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

■ We hold that the distributions which petitioner received in 1945 were amounts distributed in partial liquidation of Mokan; each distribution was "one of a series of distributions in complete cancellation or redemption of all * * * [Mokan's] stock" I.R.C. Section 115(i); therefore such amounts so distributed in partial liquidation are to be treated "as in part * * * payment in exchange for the stock." I.R.C. Section 115(c). The tax court committed error in holding otherwise.

In support of the judgment of the tax court, the Commissioner says there is no evidence of a final decision or settled purpose to liquidate the corporation. There is no question of good faith raised by the Commissioner.

We believe that the evidence shows that the Mokan plan contemplated a series of distributions to stockholders in complete cancellation or redemption of all of its stock. For that purpose each distribution is a partial liquidation within the meaning of § 115(i). When the series is completed, the distributions will constitute full payment in exchange for the stock, within the meaning of § 115

(c). They are not dividends within the meaning of § 115(a).

These conclusions are supported by facts appearing in evidence, the more important of which are:

(a) The intention to liquidate came into existence on March 27, 1944. Between 1937, when Mokan emerged from receivership, and July 7, 1942, Mokan had as its objective the elimination of Columbia from control of Panhandle. By July 7, 1942, that objective had been accomplished through Mokan's establishing ownership of 65.63% of the total outstanding shares of Panhandle. Having reached that point, Mokan's board adopted a resolution explicitly recognizing that accomplishment, expressing its belief that appropriate steps should be taken to effect the orderly liquidation of Mokan and to guarantee the independence of Panhandle, and appointing a committee to report to the board the most appropriate means of accomplishing those ends. In an apparently logical sequence, the board, on February 14, 1944, adopted the plan now under consideration. In the first part of this plan Mokan offered to sell to its shareholders, as a step in the process of winding up its affairs, and as a means of providing funds for the prepayment of a long-term secured indebtedness, 163,710 shares of Panhandle at $30 per share. In the second part, Mokan offered to exchange substantially the balance of its Panhandle stock for all its own stock. The plan specifically provides for the cancellation of Mokan shares surrendered by shareholders. The plan was approved by the stockholders of Mokan on March 27, 1944.[6]

6. We see no relevance in the fact that there is no showing in the record that Mokan ever filed with the commissioner the information form (No. 966) required by law to be filed when a corporation is to be dissolved or liquidated. It is true that § 148(d) of the Internal Revenue Code, 26 U.S.C.A. § 148(d), requires such a return to be filed within thirty days after the adoption by a corporation of "a resolution or plan for the dissolution of the corporation or for the liquidation of the whole or any part of its capital stock," and that Treasury Regulation 111, § 29.148–2 details the requirements for the filing thereof. We do not think that these omissions, if any, indicate that the stockholders "never made a final decision to liquidate the corporation" as contended by the commissioner.

We hold that these undisputed facts indicate an intention to liquidate.

(b) Subsequent events show a persistent and uninterrupted intention to pursue the plan to final liquidation.

After the sale to its shareholders of 163,710 shares of Mokan's Panhandle stock, to provide funds to pay Mokan's indebtedness, and after distribution to its shareholders of 363,800 shares of Panhandle stock held by Mokan, in cancellation or redemption of their Mokan stock, Mokan was left with about 4,000 shares for expenses of liquidation and contingencies. In 1944 Mokan paid off its indebtedness of $5,050,000, sold its investment in Kentucky Natural Gas Corporation, and terminated its service contract with that company. By 1951 it had settled all of its pending eight lawsuits. It began in 1945 to contract its office space and staff, and by 1952 it had only two salaried officers, one part-time, and two other employees, one part-time.

These undisputed facts demonstrate the cessation of all business activities except those essential to liquidation.

(c) The liquidation of Mokan's assets and the cancellation or redemption of its stock, indicate a continued and undeviating process of liquidation. Giving recognition to the receipt by Mokan of the Hugoton stock (which was covered by an amendment to the Mokan plan), it appears that by the end of 1952 Mokan's assets had been reduced 80.41%, and that all cash received by Mokan, whether from dividends on Panhandle stock or otherwise, was immediately distributed. From 1944 to 1952, inclusive, Mokan reduced the number of its outstanding shares of common stock from 1,594,755 to 473,172, and its class "B" shares (one share of which, on liquidation, is worth 1/20 of one common share) from 847,006 to 458,356.

While we do not disagree with the Commissioner's contention that the length of time actually consumed in carrying out a purported plan of liquidation is an element to be considered, we do not believe that there is any inflexible element in the time factor, especially where a plan calls for liquidation through a series of distributions. While under a prior statute [7] there was a rigid time limit of two years fixed, computed from the close of the taxable year during which the first of a series of liquidation distributions was made, that restriction was removed from the act which governs in this case. This evinces a congressional intent to leave to the courts the right to weigh the time element of performance of liquidation in series, in arriving at a determination of whether the plan is being carried out. In performing that function we must recognize that while the size and intricacies of operation of one corporation might reasonably require but a year or two for its orderly, voluntary liquidation, many years might reasonably be required for such a liquidation of another corporation. We see no evidence in this record of any lapse of time in execution of the Mokan plan so extensive as to interfere with the original intention. While we do not believe that, as a practical matter, the shareholders might not change their minds and reject any liquidation plan, even after it has been partially executed, we find no such action or even intention to so act, in this case.

The acquisition of Hugoton shares required an amendment of the Mokan plan and its ratification by the stockholders. In view of the problems arising in the execution of the plan, and the progress made, we believe that the time consumed in liquidation of Mokan to date has not been unreasonable. It has been liquidated as quickly as is consistent with the interests of the shareholders. The law requires nothing further.

Section 115(i) does not require a cancellation of stock contemporaneously with each separate distribution in a series of distributions. Obviously no stockholder can be required to have his stock physically cancelled until he has been paid in

---

**7.** Act of 1936, 26 U.S.C.A. § 115(c).

full the amount due thereon in liquidation.

In view of our conclusion it will not be necessary for us to pass upon other points raised by the parties.

For the reasons hereinbefore set forth, the decision of the tax court is reversed.

FINNEGAN, Circuit Judge.
I concur in the result.