ESTATE OF WILLIAM G. MAGUIRE, DECEASED, MARIAN L. MAGUIRE, ROBERT M. MORGENTHAU AND UNITED STATES TRUST COMPANY OF NEW YORK, EXECUTORS, AND MARIAN L. MAGUIRE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3359-64.   Filed April 24, 1968.

---

*Ben Herzberg, Richard E. Aikman,* and *Eugene S. Linett,* for the petitioners.

*James Q. Smith* and *Robert M. Pearl,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $213,909.24 in income taxes of the petitioners for the taxable year 1960. In this case, we have two issues— whether the corporation Mokan was in liquidation in 1960, and whether the respondent is collaterally estopped from raising that issue as a result of an earlier decision holding that Mokan was in liquidation in 1945.

FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners were husband and wife and legal residents of New York, N.Y., at the time the petition was filed in this case. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue, Manhattan, New York. William G. Maguire died on September 28, 1965, and his executors, Marian L. Maguire, Robert M. Morgenthau, and the United States Trust Co. of New York, were substituted for him as petitioners in this case.

Throughout 1960, the petitioners owned stock in the Missouri-Kansas Pipe Line Co. (Mokan). Mokan had outstanding two classes of stock, common and class B; each share of class B was entitled to one-twentieth of any distribution made on a share of common. In 1960, Mokan made quarterly cash distributions to its shareholders totaling $1,523,922.73, which was $3.60 per share of common stock and $0.18 per share of class B stock. Mokan's earnings and profits for the year exceeded $1,523,922.73. Mr. Maguire's share of the cash distributions made by Mokan in 1960 was $293,169.08, and Mrs. Maguire's share was $32,940.72. In their return for 1960, the petitioners reported their total shares of the cash distributions made by Mokan as liquidating distributions, and, since they reported that their cost bases for the shares had been exhausted, they included such amounts as long-term capital gains.

Mokan was organized in 1928, and a wholly owned subsidiary of Mokan, Panhandle Eastern Pipe Line Co. (Panhandle), was organized in 1929. In 1930, Panhandle began construction of a natural gas pipeline from the panhandle of Texas to a point near the Illinois-Indiana border.

During the period 1930–1943, Columbia Gas & Electric Corp. (Columbia Gas) was one of the largest public utility holding companies in the United States. To raise funds for the construction of the pipeline, Mokan sold to a subsidiary of Columbia Gas, Columbia Oil & Gasoline Corp. (Columbia Oil), one-half of the Panhandle stock in 1930 and in effect pledged the remaining half in 1931. In a number of States, Columbia Gas, which sold manufactured gas, was in direct competition with Panhandle.

On March 18, 1932, Mokan was placed in receivership. On March 6, 1935, the United States commenced an antitrust suit against Columbia Oil, Columbia Gas, and others. On January 20, 1936, a consent decree was entered in that suit under which Columbia Oil was required to return to Mokan one-half of the Panhandle stock. Under the terms of the decree, Mokan received 324,326 shares and rights to subscribe to 80,000 shares. These rights were required to be distributed by Mokan to its stockholders. Columbia Oil retained 324,326 shares and rights to subscribe to 80,000 shares, which it exercised. Such exercise gave Columbia Oil 404,326 shares and control of Panhandle. In 1937, Mokan was released from receivership.

In 1937, prior to the release of Mokan from receivership, a meeting of Mokan's stockholders was held pursuant to the order of the Chancery Court of Delaware. At this time the question whether Mokan should be completely liquidated was raised. Two slates of directors were presented backed by two contending groups of stockholders, one group favoring complete liquidation of Mokan and the other, the Maguire Committee, opposing liquidation. The stockholders elected the slate of proposed directors supported by the Maguire Committee, and the petitioner, Mr. Maguire, became president of Mokan on August 17, 1937, a position he retained until the date of his death.

During the time Columbia Gas had control of Panhandle, an extension was added to the pipeline from the Illinois-Indiana border to Detroit, Mich. In February of 1942, Panhandle secured title to that extension from a subsidiary of Columbia Gas.

Prior to March of 1942, Columbia Oil owned all of a small issue of Panhandle preferred stock that carried the right to elect two out of the nine directors of Panhandle. The Securities and Exchange Commission ordered, in March 1942, the cancellation of those voting rights.

In 1943, Columbia Oil, as a result of various legal actions that had been brought against it by Mokan and of proceedings before the Securities and Exchange Commission, agreed to divest itself of its Panhandle stock, which was then acquired by Phillips Petroleum Co. (Phillips) for the account of itself and Mokan, each receiving one-half of such stock. Phillips also contracted to dedicate 175,000 acres

of proven gas reserves to Panhandle. As a result of such agreement, Mokan held more than 65 percent of Panhandle's outstanding stock.

In November of 1943, Mokan's board of directors, acting upon Mr. Maguire's recommendation, stated in a resolution that the principal objectives of Mokan had been accomplished and appointed a committee, headed by Mr. Maguire, to study means of liquidating Mokan while at the same time continuing the operation of Panhandle as an independent company. In February of 1944, the committee made its report to the board of directors. The committee indicated that a merger with Panhandle was not feasible and opposed a statutory dissolution of Mokan on the ground that many large stockholders were unwilling to be confronted with a large capital gains tax. The committee also indicated that a statutory dissolution might entail long delay and large expenses. The committee proposed a plan that would, in the words of the committee, "offer the stockholders the greatest opportunity to work out their own individual tax problems to best advantages and still give the stockholders speedy and economical distribution pro rata of substantially all of the assets." The plan, later known as the Mokan Plan, consisted of two parts. The first part called for a sale by Mokan to its stockholders of about 163,000 shares of Panhandle at a price calculated to yield sufficient funds to discharge Mokan's then existing indebtedness of $5,050,000. The second part consisted of an offer to Mokan's stockholders to exchange for their stock the Panhandle stock owned by Mokan, at the ratio of 2 shares of Panhandle for every 9 shares of Mokan common or 180 shares of Mokan class B. The plan was approved by the board of directors and, on March 27, 1944, by the stockholders. At the stockholders meeting, a motion was made, but rejected, that urged Mokan's management to "withdraw the liquidation and dissolution plan, known as the 'Mokan Plan'."

Originally, the exchange offer to stockholders under the second part of the Mokan Plan was to be in effect only until April 15, 1945. The period of time during which stock could be exchanged was then extended to expire on October 15, 1945. Further extensions of time were approved by Mokan's board of directors, the last of which expired on June 30, 1952. Effective on that date, the period of time during which stock could be exchanged was extended indefinitely, subject to termination of the offer by action of the stockholders or board of directors.

Beginning in 1945, Panhandle several times split its stock, and the Mokan exchange offer was increased to give effect to the splits. In 1948, Panhandle organized Hugoton Production Co. (Hugoton) and transferred to Hugoton its gas reserves in Kansas in exchange for all of Hugoton's capital stock. Panhandle distributed that stock to its

stockholders, and Mokan enlarged the exchange offer to include Hugoton shares as well as Panhandle shares.

Originally, Mokan had established a reserve of some of the Panhandle stock, and later of the Hugoton stock, to cover the estimated cost of final liquidation or other nonrecurring expenses, and Mokan withheld that reserve from the exchange offer. In July 1963, effective retroactively to January 1, 1962, Mokan determined that part of the reserve was unnecessary and enlarged the exchange offer to include additional shares of Panhandle and Hugoton stock.

In 1965, the Mokan board of directors adopted a resolution providing that the exchange offer should automatically reflect any additional shares of stock received by Mokan from Panhandle and Hugoton.

Throughout 1960, the taxable year involved in this case, the exchange offer provided for the exchange of 16 shares of Panhandle stock and 2 shares of Hugoton stock for 9 shares of Mokan common or 180 shares of Mokan class B stock.

At all times, the acceptance of the exchange offer was optional with the Mokan stockholders, and no action has been taken by vote of the stockholders or board of directors to require the stockholders to exchange their Mokan stock.

By the end of 1944, the year the Mokan Plan was adopted, Mokan had discharged all of its indebtedness with the proceeds from its sale of Panhandle stock to its stockholders. By the same time, Mokan had sold a relatively small investment in Kentucky Natural Gas Corp. and terminated a contract to provide that corporation with certain technical services. Thus, at the end of 1944, Mokan's only asset of any significance was its Panhandle stock. In 1947, Mokan registered with the Securities and Exchange Commission as a nondiversified management investment company under the Investment Company Act of 1940. Also in 1947, Mokan considered a merger with Panhandle but decided against it. Before the end of 1951, Mokan disposed of all litigation to which it had been a party.

Between 1943 and 1952, Mokan reduced its staff from three full-time officers and seven other full-time employees to two officers, one of whom was part-time, and two employees, one of whom was part-time. Since 1952, Mokan's staff has remained at such level. In 1945, Mokan gave up all of its office space except two rooms, one of which was used for storage of corporate records, but since 1960 Mokan has occupied three rooms, one of which is used for storage. On the same floor as Mokan's three rooms are the offices of Panhandle and Hugoton. The three companies share a common telephone switchboard and electric

bill. In 1965, Mokan purchased an annuity for its only full-time officer.

Mokan has at all times adhered to the plan of exchanging Panhandle and Hugoton stock for the Mokan stock offered it, and prospectuses and amendments, copies of which were sent to Mokan stockholders, were filed from 1944 through 1966 pursuant to the Securities Act of 1933.

Since the adoption of the Mokan Plan, each prospectus filed with the Securities and Exchange Commission concerning the plan stated that "each of the present officers and directors of Mokan who is a stockholder of Mokan has stated that he has no present intention of accepting the Exchange Offer but reserves the right to accept the same at any time." Such prospectuses also indicated that it was not possible to forecast the further percentage of Mokan stockholders who would accept the exchange offer, and the prospectuses for 1944 through 1954 stated that the board of directors of Mokan had no present intention as to the continuance or dissolution of Mokan after the expiration of the exchange offer.

In October of 1943, the month before Mokan's committee began its study of possible methods of liquidation, Mrs. Maguire owned of record 6,500 shares of Mokan common stock and 93,046 shares of class B stock. At the same date, Mr. Maguire owned of record 24,350 shares of Mokan common stock and 26,825 shares of class B stock. At the end of 1945, Mrs. Maguire owned of record 23,300 shares of common stock and 122,181 shares of class B stock, and Mr. Maguire owned of record 30,350 shares of common stock and 40,015 shares of class B stock. At the end of 1960, Mrs. Maguire owned of record 8,291 shares of common stock and 17,184 shares of class B stock, and Mr. Maguire owned of record 74,134 shares of common stock and 146,037 shares of class B stock. Neither Mr. nor Mrs. Maguire exchanged any of their stock under the Mokan Plan in 1960.

At all material times until his death, Mr. Maguire was authorized by Mokan's board of directors to vote Mokan's Panhandle stock at Panhandle annual meetings. Until his death, Mr. Maguire had been a director of Panhandle since 1937, chairman of the board of directors since 1943, and president since 1953. Mr. Maguire also served as president and director of Hugoton from 1949 until his death. He received substantial compensation from Mokan, Panhandle, and Hugoton during the years 1944 through 1965; for example, his compensation for 1960 was $13,000 from Mokan, $124,583 from Panhandle, and $21,666.67 from Hugoton. He also received stock options from Panhandle having substantial values.

The following table shows the outstanding stock of Mokan since before the adoption of the Mokan Plan, the amount of stock exchanged each year under the plan, and the stock exchanged each year as a percentage of the stock outstanding on December 31, 1943:

COMMON STOCK

| Year | Outstanding at end of year | Exchanged during year | Percent exchanged during year | Year | Outstanding at end of year | Exchanged during year | Percent exchanged during year |
|---|---|---|---|---|---|---|---|
| 1943___ | 1, 594, 755 | _____ |  | 1955___ | 442, 755 | 9, 813 | 0. 6 |
| 1944___ | 1, 430, 867 | 163, 888 | 10. 3 | 1956___ | 432, 877 | 9, 878 | . 6 |
| 1945___ | 899, 084 | 531, 783 | 33. 4 | 1957___ | 424, 755 | 8, 122 | . 5 |
| 1946___ | 749, 663 | 149, 421 | 9. 3 | 1958___ | 412, 084 | 12, 671 | . 8 |
| 1947___ | 664, 524 | 85, 139 | 5. 4 | 1959___ | 406, 943 | 5, 141 | . 3 |
| 1948___ | 565, 310 | 99, 214 | 6. 2 | 1960___ | 400, 814 | 6, 129 | . 4 |
| 1949___ | 549, 929 | 15, 381 | 1. 0 | 1961___ | 391, 949 | 8, 865 | . 6 |
| 1950___ | 522, 037 | 27, 892 | 1. 7 | 1962___ | 389, 516 | 2, 433 | . 1 |
| 1951___ | 488, 057 | 33, 980 | 2. 1 | 1963___ | 368, 762 | 20, 754 | 1. 3 |
| 1952___ | 473, 172 | 14, 885 | 1. 0 | 1964___ | 325, 759 | 43, 003 | 2. 7 |
| 1953___ | 464, 657 | 8, 515 | . 5 | 1965___ | 316, 975 | 8, 784 | . 6 |
| 1954___ | 452, 568 | 12, 089 | . 8 | 1966___ | 231, 866 | 85, 109 | 5. 3 |

CLASS B STOCK

| Year | Outstanding at end of year | Exchanged during year | Percent exchanged during year | Year | Outstanding at end of year | Exchanged during year | Percent exchanged during year |
|---|---|---|---|---|---|---|---|
| 1943___ | 847, 006 | _____ |  | 1955___ | 427, 336 | 8, 220 | 1. 0 |
| 1944___ | 834, 816 | 12, 190 | 1. 5 | 1956___ | 420, 056 | 7, 280 | . 9 |
| 1945___ | 782, 076 | 52, 740 | 6. 1 | 1957___ | 415, 096 | 4, 960 | . 5 |
| 1946___ | 717, 201 | 64, 875 | 7. 8 | 1958___ | 408, 416 | 6, 680 | . 8 |
| 1947___ | 685, 591 | 31, 610 | 3. 7 | 1959___ | 400, 266 | 8, 150 | 1. 0 |
| 1948___ | 512, 166 | 173, 425 | 20. 5 | 1960___ | 394, 326 | 5, 940 | . 7 |
| 1949___ | 507, 261 | 4, 905 | . 6 | 1961___ | 388, 926 | 5, 400 | . 6 |
| 1950___ | 492, 386 | 14, 875 | 1. 7 | 1962___ | 387, 366 | 1, 560 | . 2 |
| 1951___ | 471, 291 | 21, 095 | 2. 5 | 1963___ | 381, 606 | 5, 760 | . 7 |
| 1952___ | 458, 356 | 12, 935 | 1. 5 | 1964___ | 349, 226 | 32, 380 | 3. 8 |
| 1953___ | 450, 726 | 7, 630 | . 9 | 1965___ | 298, 826 | 50, 400 | 6. 0 |
| 1954___ | 435, 556 | 15, 170 | 1. 8 | 1966___ | 136, 386 | 162, 440 | 19. 1 |

The following table shows Mokan's net income after taxes for each year since the adoption of the Mokan Plan, cash distributions to stockholders in each year, and the market value of Panhandle and Hugoton stock held by Mokan as of the end of each year. Such market value was computed by multiplying the market value of one share by the total shares held by Mokan:

| Year | Income | Distributions | Value of Panhandle and Hugoton stock |
|---|---|---|---|
| 1944 | $974,095 | $878,585 | $16,350,562 |
| 1945 | 776,096 | 1,578,885 | 16,053,500 |
| 1946 | 810,383 | 824,206 | 16,008,977 |
| 1947 | 886,144 | 735,361 | 16,588,873 |
| 1948 | 780,759 | 656,468 | 13,673,674 |
| 1949 | 667,460 | 644,940 | 22,290,471 |
| 1950 | 910,462 | 891,581 | 23,663,528 |
| 1951 | 824,087 | 846,397 | 31,952,810 |
| 1952 | 1,015,873 | 1,002,658 | 43,503,016 |
| 1953 | 1,056,935 | 1,031,780 | 36,639,098 |
| 1954 | 1,121,376 | 1,079,519 | 39,626,019 |
| 1955 | 1,359,374 | 1,261,796 | 41,387,789 |
| 1956 | 1,329,849 | 1,375,291 | 53,479,924 |
| 1957 | 1,645,333 | 1,616,292 | 37,251,090 |
| 1958 | 1,578,856 | 1,580,927 | 56,412,643 |
| 1959 | 1,585,119 | 1,544,003 | 46,416,663 |
| 1960 | 1,564,242 | 1,523,923 | 48,534,551 |
| 1961 | 1,577,397 | 1,537,953 | 49,287,056 |
| 1962 | 1,657,058 | 1,639,794 | 61,228,316 |
| 1963 | 1,736,632 | 1,743,557 | 62,423,017 |
| 1964 | 1,920,142 | 1,854,327 | 61,812,564 |
| 1965 | 1,972,090 | 1,844,774 | 57,572,024 |
| 1966 | 1,751,441 | 1,648,988 | 37,048,245 |

*Prior Litigation*

In 1953, the Tax Court, in *W. G. Maguire & Co.*, 20 T.C. 20, decided that the distributions received by the petitioners in that case, including Mr. and Mrs. Maguire, from Mokan in 1944 were not taxable dividends since the distributions were not made out of the earnings and profits of Mokan. It was thus not necessary for the Court to decide whether such distributions were taxable as dividends at ordinary income rates or as liquidating dividends at capital gains rates, but at pages 36 and 37 the Court said of the Mokan Plan:

While the complete execution of the Mokan Plan will liquidate Mokan, it is the second step which would bring about the corporate liquidation. The carrying out of the first step obviously does not liquidate Mokan for Mokan remained a corporation in being after the first step was completed during 1944. The execution of step two does not automatically follow after execution of step one. As a matter of fact, the second step of the Mokan Plan has never been executed, except in part. So viewing the Mokan Plan, we see no merit in petitioners' contention that the distributions in question were made in partial liquidation within the meaning of section 115 (c) and (i) of the Code.

No appeal was taken from the Tax Court's decision.

The next year, 1954, the Tax Court, in *William G. Maguire*, 21 T.C. 853, decided that distributions received by Mr. Maguire from Mokan in 1945 were not distributions in partial liquidation but were dividends taxable at ordinary income rates. In that case, the Commissioner argued that Mr. Maguire was estopped by the principle of collateral estoppel from raising the liquidation issue since the Tax Court had said in the previous year that the Mokan distributions were not distributions in partial liquidation. The Court, at page 855, stated, "The question of res judicata will not be decided because we think the Court reached

a correct conclusion on the point in the prior decision and we stand by that decision here."

This decision of the Tax Court was appealed by Mr. Maguire (*Magure* v. *Commissioner*, 222 F. 2d 472 (C.A. 7, 1955)), and the record in the Court of Appeals has been made a part of the record in this case. The Court of Appeals reversed the Tax Court's decision and held that the 1945 Mokan distributions were distributions in liquidation. The Court of Appeals had before it many of the same facts we have here except that the record before the Court of Appeals was closed with factual information regarding the operations of Mokan and the Mokan Plan in the year 1952.

OPINION

The ultimate question in this case is whether the petitioners are entitled to treat the distributions which they received from Mokan in 1960 as distributions in liquidation of Mokan. The petitioners contend that the respondent is collaterally estopped by the decision of the Seventh Circuit in the earlier *Maguire* case from questioning the right to such treatment, unless there has been a material change in the facts of Mokan's operations, and that there has been no such change in facts. In the alternative, the petitioners argue that if collateral estoppel does not apply, Mokan was in 1960 in the process of complete liquidation. We consider first the questions relating to the applicability of the doctrine of collateral estoppel.

### Collateral Estoppel

Any discussion of the applicability of collateral estoppel in the field of taxation must begin with a review of *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). The taxpayer in *Sunnen* was an inventor who also controlled a corporation. He entered into four agreements licensing the corporation to manufacture and sell various devices on which he had applied for patents. He assigned to his wife, without consideration, all his right, title, and interest in the license contracts. Royalties were then paid by the corporation to the wife in the years 1937 through 1941. In a prior proceeding in 1935, the Board of Tax Appeals had determined with respect to the tax years 1929–31 that the taxpayer was not taxable on the royalties paid to his wife under one of the license agreements. In regard to the tax years 1937–41, the Tax Court held that the taxpayer was taxable on all of the royalties paid to his wife with the exception of the royalties paid under the license agreement previously considered by the Board. All of the agreements were substantially identical, and the taxpayer argued before the Supreme Court that the Board's decision as to one agreement was binding as to all of the agreements for the later tax years.

The Supreme Court first clarified the distinction between the doctrines of res judicata and collateral estoppel and pointed out that since different taxable years were involved in the *Sunnen* case before it, its decision turned on whether collateral estoppel was applicable. The Court said in part:

That principle [collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. It is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers.

\* \* \* It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. \* \* \* And where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive. \* \* \*

Of course, where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different. \* \* \* And if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case.[7] Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of *stare decisis*. \* \* \* [Footnote omitted. 333 U.S. at 599–601.]

The Court concluded that collateral estoppel did not apply to the license agreements which had not been previously considered by the Board. It also found that since the earlier decision by the Board, there had been a change in the controlling case law so that collateral estoppel did not apply to prevent the Board from reconsidering the license agreement previously considered by it.

The opinion of the Supreme Court has been subject to several interpretations as to how or whether collateral estoppel applies to a decision of a factual question. See *United States* v. *Russell Manufacturing Co.*, 349 F. 2d 13 (C.A. 2, 1965); *Consolidated Edison Co. of New York* v. *United States*, 279 F. 2d 152 (C.A. 2, 1960), affd. 366 U.S. 380 (1961); Branscomb, "Collateral Estoppel in Tax Cases," 37 Tex. L. Rev. 584 (1959). Without doubt, it does apply to a decision of a static fact; that is, a transaction or event that is completed before any of the litigation begins and that is not subject to change, although it has tax consequences in the subsequent years involved in the litigation. The difficulty arises over whether collateral estoppel applies to a decision of a contin-

uing or recurring fact; that is, a factual situation which continues or recurs from year to year but which may change from time to time. Some courts hold that collateral estoppel does not apply to such a factual decision; but other courts hold that it does apply when there is no material change in the facts.

Fortunately, we need not choose between these interpretations, for under any of them, collateral estoppel does not apply in the case before us. Whether a corporation is in the process of complete liquidation is a factual question. *Rollestone Corporation*, 38 B.T.A. 1093, 1105 (1938). "There must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto." *Fred T. Wood*, 27 B.T.A. 162, 166–167 (1932). If the application of collateral estoppel to factual determinations is restricted to static fact cases, then it does not apply to the case before us. Whether Mokan was in the process of liquidation in 1960 does not depend solely upon static facts that occurred before 1945. Rather, it depends on all of the circumstances relating to the activities and operations of Mokan both before 1945 and since that year.

The question of whether Mokan was in the process of liquidation in 1960 is a continuing or recurring factual question; that is, for purposes of determining the proper tax treatment of the distributions received by the Mokan stockholders, it is necessary to decide each year whether Mokan was in the process of liquidation. The answer depends upon not only what happened in 1944 but also on what happened in each of the subsequent years. Some courts have held that collateral estoppel does not apply to a continuing or recurring factual determination of this type. *Alexander* v. *Commissioner*, 224 F. 2d 788 (C.A. 5, 1955), reversing on this issue 22 T.C. 318 (1954); *Stoddard* v. *Commissioner*, 141 F. 2d 76 (C.A. 2, 1944), reversing 47 B.T.A. 584 (1942); and *Linen Thread Co. Ltd.*, 4 T.C. 802 (1945), affd. 152 F. 2d 625 (C.A. 2, 1945). They hold that the facts in a later year are different facts than those occurring in an earlier year. They say that since the facts may change from year to year, a court should not be estopped from taking a new look at them each year. It is also argued that the applicability of collateral estoppel to a later year should not depend upon finding a significant change in the facts; if a party must show that there has been no material change in the facts, and if a court must hear and decide such question, there is no reason to apply collateral estoppel—no time and effort would be saved. Branscomb, *supra*. Under this approach, collateral estoppel does not apply in the case before us.

Other cases have held that collateral estoppel does apply to a determination of a continuing or recurring factual question, unless there is a material change in the facts. *Parker* v. *Westover*, 221 F. 2d 603 (C.A.

9, 1955); *Burford-Toothaker Tractor Co.* v. *Commissioner*, 192 F. 2d 633 (C.A. 5, 1951), affirming a Memorandum Opinion of this Court, certiorari denied 343 U.S. 941 (1952); *Cumberland Portland Cement Co.*, 29 T.C. 1185 (1958). Even if this test is applied in this case, we still find that collateral estoppel does not apply, because there was a sufficient change in the facts to warrant a reexamination of whether Mokan was still in the process of complete liquidation. When the Court of Appeals made its decision, it had before it evidence relating to the activities of Mokan through the year 1952. The last of the litigation which involved Mokan was settled in 1951—only a short time before the court's decision. Concluding such litigation removed one of the obstacles to complete liquidation, but it was reasonable to allow Mokan some time to complete the liquidation and not to expect it to occur immediately after the settlement of the litigation. However, we now have evidence for the years through 1966, and we see that the settlement of the litigation did not significantly alter the process of liquidation; no efforts were made to accelerate the pace of liquidation or to bring to an end the operations of Mokan.

Furthermore, when the Court of Appeals made its judgment, it had evidence showing that a large number of stockholders had taken advantage of the offer and redeemed their stock in the early years. It also had evidence that the rate of redemption had declined very considerably in the late forties and early fifties. The latter evidence may have caused the court to wonder how long it would take to liquidate completely the assets of Mokan, but that fact was merely one of a number of circumstances which the court considered in forming its judgment. The slow rate of contraction in the late forties and early fifties was not, in the opinion of the Court of Appeals, enough to overcome other circumstances which caused the court to conclude that Mokan was in the process of liquidation. Now, though, we have evidence showing the rate of contraction for 14 additional years. Such evidence shows a continuing slow rate of contraction. It makes very clear that the assets of Mokan will not be completely liquidated for many, many years. Moreover, the decision by the Court of Appeals allowing capital gains treatment for the distributions received by the Mokan stockholders provided an additional reason for them to be in no hurry to redeem their Mokan stock. Also, despite the exceedingly slow rate of contraction, Mokan has taken no action to bring the matter to a conclusion, to compel stockholders to submit their stock for redemption, and to wind up the affairs of Mokan. Taking all of this additional evidence into consideration, we believe that it is sufficient to cast a substantial doubt on whether a court would have reached the same decision if it had such evidence before it. Hence, we believe that it constitutes a material change in the facts which existed at the time of the decision by the Court of Appeals.

Our conclusion that collateral estoppel does not apply so as to prevent the respondent from raising the question as to whether Mokan was in the process of complete liquidation in 1960 does not mean that we ignore the decision of the Court of Appeals, nor the earlier decision of this Court. The doctrine of stare decisis does apply, and accordingly, those decisions will be considered by us. We will consider whether to follow the earlier decision of this Court, or the decision of the Court of Appeals, or whether that case is distinguishable from the one now before us.

### Corporate Liquidations

Now we turn to the question of whether Mokan was in the process of complete liquidation in 1960. Section 392 of the Internal Revenue Code of 1954 provides that such Code provisions pertaining to liquidation "shall apply with respect to a plan of liquidation only if the first distribution in pursuance of such plan occurs on or after June 22, 1954." Thus, since the petitioners contend that Mokan began to liquidate in 1944, the case is governed by the provisions of the Internal Revenue Code of 1939. As amended in 1942, section 115 of such Code provided in relevant part:

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. * * *

No contention has been made that the Mokan Plan was a plan of partial liquidation; the case is presented to us as turning on whether Mokan was in the process of complete liquidation, and accordingly we will decide the case on that issue.

A good description of what constitutes a liquidation appears in *Fred T. Wood, supra* at 166–167, where the Court said:

Liquidation has been defined as the operation of winding up the affairs of a corporation by realizing upon its assets, paying its debts and appropriating the amount of its profits or loss. * * * It differs from the normal operation of the corporation for current profit in that it ordinarily results in the winding up of the corporation's affairs. There must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto. It contemplates an impairment of capital or a retirement of outstanding stock, though a distribution, if one of a series of distributions in liquidation, may be a liquidating dividend even if it, of itself, does not impair capital. Liquidation can not be brought about by mere declaration, and the question of whether a corporation is in liquidation is therefore one of fact. * * *

Thus, there are three basic tests: (1) There must be a manifest intention to liquidate; (2) there must be a continuing purpose to terminate corporate affairs; and (3) the corporation's activities must be directed to such termination.

In its decision, *Maguire* v. *Commissioner*, 222 F. 2d 472 (C.A. 7, 1955), the Court of Appeals found that there was a manifestation of an intention to liquidate Mokan and held that the distributions received by Mr. Maguire in 1945 were in partial liquidation of Mokan. Since the evidence relating to the intention to liquidate was all available at the time of the decision by the Court of Appeals, we accept the finding of that court that there was some intention to liquidate. However, although the evidence is consistent with a finding of a partial contraction, there was a question as to whether the Mokan Plan would ever result in a complete liquidation. Since the decision as to whether to redeem was left to each stockholder, the liquidation would not be completed unless or until all stockholders choose to redeem. The evidence then available to the Court of Appeals showed a substantial contraction of Mokan, but at that time, no one knew whether the remaining stockholders would ever offer their stock for redemption.

To determine whether after the adoption of the Mokan Plan, Mokan's activities were directed to bringing about the termination of the affairs of the corporation and its liquidation, we look at the activities of Mokan since the adoption of the Mokan Plan. Mokan discharged all of its indebtedness by the end of 1944. By the same time, it sold its investment in Kentucky Natural Gas Corp. and terminated a service contract with that corporation. Mokan reduced its staff and office space to a minimum level between 1943 and 1952. By the end of 1951, it had disposed of all litigation to which it had been a party. Mokan faithfully adhered to the Mokan Plan exchange offer. These activities are all consistent with a liquidation of Mokan. However, they are also consistent with a mere contraction of Mokan, and nothing has been done to complete the liquidation of Mokan in the foreseeable future.

The most significant test in this case is whether Mokan had a continuing purpose to terminate its affairs and dissolve. Although the Court of Appeals found that in 1944 Mokan manifested some intention to liquidate, the subsequent events show clearly a lack of purpose to terminate completely the affairs of Mokan.

A corporation in liquidation may engage in business for profit and distribute its earnings to its stockholders. *R. D. Merrill Co.*, 4 T.C. 955 (1945). A corporation in liquidation need not suspend all activity, and if it realizes earnings, those earnings may be distributed to the stockholders together with the other assets of the corporation. However, the cases so holding are significantly different from the Mokan operations. In them, the business was being contracted, and the delay in contraction resulted from decisions by the corporation that for business reasons the contraction should be spread out. In contrast, Mokan has not contracted much in the past 20 years, and the delay is not

due to business decisions made by the corporation, but rather results from the fact that the decision is left to each stockholder. Consider the consequences of applying the *Merrill* and other holdings to the situation before us. Mr. Maguire and the other stockholders of Mokan were receiving the passthrough of Panhandle and Hugoton dividends, reduced only slightly as a result of the expenses and taxes of Mokan. They received these dividends in 1960 and for many preceding years, and if this case were decided for them, they would continue to receive them for many more years. To hold that the dividends of Panhandle and Hugoton can be converted into capital gains in this manner is wholly inconsistent with the concept of a corporation in liquidation. It is one thing to allow a corporation which is launched upon a program of liquidation to distribute its earnings to its stockholders as capital gains, but it would be an extension of logic beyond reason to apply a similar rule in this case.

Some protracted liquidations have been approved by the courts. *R. D. Merrill Co.*, *supra; J. Paul McDaniel*, 25 T.C. 276 (1955) ; *Estate of Charles Fearon*, 16 T.C. 385 (1951) ; *Rollestone Corporation*, *supra*. The courts have wisely said that they will not substitute their judgment for that of the directors as to how and when the assets of the corporation should be liquidated. Yet, the approval of those plans of liquidation does not mean that Mokan was in the process of complete liquidation. In those cases, the corporations were launched upon a plan that would ultimately result in the complete liquidation of the corporation, and at the time of the trial, the liquidations were almost completed. On the other hand, when the Mokan Plan was adopted in 1944, no one could foretell how rapidly the stockholders would offer their stock for redemption. Although many did take up the offer in the early years, the rate then slowed to a trickle, and it has remained a trickle for 20 years. Under the Mokan Plan, the corporation had no control over whether a liquidation would ever occur; it would depend upon all of the stockholders choosing to redeem their stock. Although the effect of the plan was not so apparent when it was adopted, with the passage of time it became apparent the complete liquidation was not going to occur soon and might never occur. Yet, the corporation has taken no action to bring about the termination of Mokan. If the corporation really had a continuing purpose to liquidate, it would have reacted to the slow rate of redemptions and taken some action to complete the liquidation.

Although many stockholders have redeemed their stock and many of the assets have been distributed, Mokan hardly looked like a corporation in liquidation in 1960. A corporation with assets worth more than $48,534,551 and income of $1,564,242 is hardly a mere corporate shell. Apparently, it was still considered a very attractive investment by

some stockholders. In fact, the Maguires apparently considered the stock attractive enough that they acquired more of it over the years. Furthermore, when one considers the compensation which Mr. Maguire received from Mokan, Panhandle, and Hugoton in 1960 and the positions that he held with the corporations, it is easy to understand that he might not be anxious to have Mokan completely liquidated. All these circumstances lead us to believe that it is clear there was no continuing purpose to terminate the affairs of Mokan.

Although we have considered the earlier decision by this Court and the decision of the Court of Appeals, we need not decide whether to follow the one or the other. The additional information which is now available about the operations of the Mokan Plan makes this case distinguishable from the case before the courts at that time. Thus, irrespective of whether it was proper to conclude that Mokan was in the process of liquidation in 1945, we think that it is clear that it was not in 1960.

In order to reflect the agreement of the parties concerning other adjustments in the notice of deficiency,

*Decision will be entered under Rule 50.*