**MIDLAND DISTRIBUTORS, INC.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 72–3019.

United States Court of Appeals,
Fifth Circuit.

July 11, 1973.

---

Stephen T. Dean, Charles H. Egerton, Orlando, Fla., for plaintiff-appellant.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Meyer Rothwacks, Jay R. Weill, Attys., Robert S. Watkins, Asst. U. S. Atty., Washington, D. C., John L. Briggs, U. S. Atty., Jacksonville, Fla., for defendant-appellee.

Before AINSWORTH, GODBOLD and CLARK, Circuit Judges.

AINSWORTH, Circuit Judge:

Midland Distributors, Inc. sued the United States for a refund of income taxes following payment under protest of an assessed deficiency. At issue on appeal are questions whether certain advances by Midland to corporations should be treated as equity capital rather than indebtedness and whether upon liquidation of the corporations when the advances were unrecoverable they should be charged as ordinary rather than capital losses. We affirm the district court's judgment in favor of the United States.

Midland is owned by Louis Fink and Melvin Wideman with its principal place of business at Orlando, Florida. Through salesmen assigned to cover various territories, Midland sells building materials and supplies throughout most of the State of Florida.

On August 7, 1963, Linark, Inc. was incorporated with its principal place of business in Cocoa, Florida. The stockholders were Midland, owner of 50 per cent for which it paid $1,250, and Otto Wry Noble, an individual who owned the other 50 per cent and paid the same amount. Midland and Noble made further advances to the corporation of $20,000 each at the time of incorporation. Linark bought its inventory of building materials from Midland at cost plus 5 per cent, stored the inventory in a rented warehouse, and sold its merchandise at a markup of about 35 per cent. This arrangement enabled Linark to service customers locally and thereby avoid any delays previously experienced when customers' orders had to be routed through Midland at Orlando. Linark operated about a year and a half before Noble wrote himself a check for several thousand dollars and disappeared. On October 15, 1964, Linark ceased operation, owing Midland $15,219.35 on open account. At that time Midland's books reflected the following:

| | |
|---|---|
| Stock investment in Linark | $ 1,250.00 |
| Notes receivable—Linark | 20,000.00 |
| Accounts receivable—Linark | 15,219.36 |
| Total | $36,469.36 |

In the liquidation of Linark, Midland received $3,000 in assets which it applied against the notes receivable, the oldest debt, thus leaving the Linark account with a balance of notes receivable of $17,000, and accounts receivable of $15,219.36. These two amounts totaled $32,219.36 and the total was charged by Midland against its reserve for bad debt, thereby producing an ordinary loss. *See* 26 U.S.C. § 166(c). The remaining stock investment of $1,250 was charged as a capital loss. *See* 26 U.S.C. §§ 165, 1211, 1221, 1222, 1223. The Internal Revenue Service reclassified the Linark note as equity capital and applied the $3,000 received in liquidation against the accounts receivable. As a result of the IRS adjustments, with respect to Linark, Midland wound up with a $12,219.36 ordinary loss on accounts receivable and with a balance of $21,250 ($20,000 + $1,250) equity as a capital loss.

On February 15, 1963, ABS Company, Inc. was incorporated with its principal place of business in Fort Pierce, Florida. The stockholders were Midland, owning 50 per cent for which it paid $1,200; William G. Cooper, an individual who owned 25 per cent and paid $600; and Henry C. Meyer who owned 25 per cent and paid $600. Midland made a further advance of $20,000, Cooper an advance of $10,000, and Meyer an advance of $10,000 at the time of incorporation. ABS had essentially the same business operation as Linark. ABS operated about two years when part of its inventory was stolen. On May 29, 1965, ABS ceased operation owing Midland $22,966.36 on open account. At that time Midland's books reflected the following:

| | |
|---|---|
| Stock investment in ABS | $ 1,200.00 |
| Notes receivable—ABS | 20,000.00 |
| Accounts receivable—ABS | 22,966.36 |
| Total | $44,166.36 |

In the liquidation of ABS, Midland received $20,000 in assets which it applied against the notes receivable, the oldest debt, thus leaving the Midland account with a balance of accounts receivable of $22,966.36. This amount was charged by Midland against its reserve for bad debt, thereby producing an ordinary loss. The remaining stock investment of $1,200 was charged as a capital loss. The Internal Revenue Service reclassified the ABS note as equity capital and applied the $20,000 received in liquidation against the accounts receivable. As a result of the IRS adjustments, with regard to ABS, Midland wound up with a $2,966.36 ordinary loss on accounts receivable and with a balance of $21,200 ($20,000 + $1,200) equity as a capital loss.

Aside from challenging the Service's treatment of the notes from Linark and ABS as equity and the Service's application of liquidation assets against accounts receivable instead of against the notes, Midland also alternatively claims the loss on the stock and notes should be treated as ordinary and necessary business expenses under 26 U.S.C. § 162(a) or an ordinary loss under 26 U.S.C. § 165(a).

## I.

 The advances made by Midland at the time of incorporation had sufficient characteristics as equity capital to justify the district court's conclusion to that effect.[1] Although the advances by the stockholders may have been reflected by corporate notes, we have previously indicated that what the parties termed the advances is not determinative. *See* United States v. Snyder Bros. Co., 5 Cir., 1966, 367 F.2d 980, 982, cert. denied, 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104 (1967). What the parties call the advances is only one of many factors to consider in deciding whether they are debt or equity for tax purposes. *See* Estate of Mixon v. United States, 5 Cir., 1972, 464 F.2d 394, 402; Montclair, Inc. v. Comm'r, 5 Cir., 1963, 318 F.2d 38, 40. No single factor is controlling. John Kelly Co. v. Comm'r, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946). Under the applicable law, each case must be judged according to its own unique fact situation. Tomlinson v. 1661 Corp., 5 Cir., 1967, 377 F.2d 291, 295.

Although taxpayer alleges Linark and ABS issued demand notes, the creditor shareholders did not intend to call the notes as long as Linark and ABS operated properly,[2] and there was no fixed maturity date. *See generally* Curry v. United States, 5 Cir., 396 F.2d 630, 634, cert. denied, 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968). By casting the advances in the form of demand notes, Midland had greater control over Linark and ABS. *See generally* In re Indian Lake Estates, Inc. v. United States, 5 Cir., 1971, 448 F.2d 574, 579.

Midland, however, relies on the fact that there was no provision in the notes subordinating them to claims of outside creditors. *Cf.* Plantation Patterns, Inc. v. Comm'r, 5 Cir., 462 F.2d 712, cert. denied, 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1972). This factor is not important here because there were no other substantial creditors. Furthermore, the debts were so large in comparison to capital contributions that it is doubtful whether Linark and ABS could have secured similar loans from an independent lending institution.

The district court found that the advances were used in part for purposes typically fulfilled by equity contributions, such as to purchase fixtures and equipment.[3] *See generally* Tyler v. Tomlinson, 5 Cir., 1969, 414 F.2d 844, 848. Even more important, these advances were subject to the fortunes of the venture in that full payment could not be expected unless Linark made a profit. *See generally* Dillin v. United

1. *See generally* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 4.04 (1971); 4A J. Mertens, The Law of Federal Income Taxation § 26.10 (1972); Plumb, The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, 26 Tax.L.Rev. 369 (1971); Stone, Debt-Equity Distinctions in the Tax Treatment of the Corporation and Its Shareholders, 42 Tul.L.Rev. 251 (1968). *See also* 26 U.S.C. § 385, passed as part of the Tax Reform Act of 1969; Comment, Toward New Modes of Tax Decision-making— The Debt-Equity Imbroglio and Dislocations in Tax Lawmaking Responsibility, 83 Harv.L.Rev. 1695 (1970).

2. Mr. Fink stated: "I never made any demand. We were willing to go along with whatever the status quo was so long as the branches [Linark and ABS] operated properly."

3. Under the standard of Rule 52(a), Fed.R. Civ.P., we do not find the district court's factual determination "clearly erroneous." Mr. Fink testified that among the assets purchased were racks for the inventory, desk, chair, and a truck for one corporation. It was reasonable to infer that these assets cost each corporation more than the capital contributions, so that the corporation had to use some portion of the advances to purchase these capital assets.

States, 5 Cir., 1970, 433 F.2d 1097, 1103. Accordingly, taxpayer cannot charge the worthless notes against its reserve for bad debt, since the debt was properly reclassified as stock.

## II.

■ The next issue concerns the application of the $3,000 of assets in the Linark liquidation and $20,000 of assets in the ABS liquidation. Taxpayer contends that these assets should be applied against the notes while the Government contends that the assets should be applied against accounts receivable. Resolution of this issue depends on the status of the notes. A leading commentator states the well-known rule that "the assets of the dissolved corporation are a trust fund against which the corporate creditors have a prior claim before that of the stockholders." 16A W. Fletcher, Cyclopedia of the Law of Private Corporation § 8161, p. 371 (1962).

Midland is a creditor with regard to the accounts receivable and a stockholder with regard to the notes now classified as equity capital. Once the notes are characterized as stock, thus preventing an unjustified bad debt deduction, it is also appropriate to classify the debt as stock for the purpose of allocating liquidation assets. Therefore, we affirm the district court's application of these liquidation assets against the accounts receivable.

## III.

■ Taxpayer contends that even if the notes were equity, an ordinary rather than a capital loss is appropriate. According to 26 U.S.C. § 1221, the term "capital asset" includes all property such as the notes here, except certain listed categories like inventory or accounts receivable acquired in the ordinary course of trade or business.

The Supreme Court had occasion to consider this definition of a capital asset in Corn Products Refining Co. v. Comm'r, 350 U.S. 46, 76 S.Ct. 20, 100 L. Ed. 29 (1955), a case involving a national manufacturer of products made from grain corn. Two years of droughts caused corn prices to rise above a level where the company could compete with cane and beet sugar. The company then purchased corn futures to assure a supply of corn at a stable price. Recognizing that the futures were an integral part of the company's manufacturing operation, the Supreme Court held that the futures were not a capital asset and Corn Products' gain on the purchase and sale of such futures was taxed as ordinary income.

This Court in Schlumberger Technology Corporation v. United States, 5 Cir., 1971, 443 F.2d 1115, applied the principle in *Corn Products* to equity where taxpayer acquired the stock and made loans to the corporations in order to obtain certain specialized expertise necessary to computerize taxpayer's business and to aid it in obtaining markets for its electronic business. When the stock and loans were divested at a loss, we held that the stock and loans were not capital assets since taxpayer purchased the assets as an integral and necessary act in the conduct of its business rather than being motivated by an investment purpose. An ordinary business expense was allowed to taxpayer.

Midland did not contribute to equity as an integral and necessary act in the conduct of Midland's business. Unlike *Corn Products* where the purchase of futures was necessary to supply basic raw material and unlike *Schlumberger* where the acquisition of a corporation with scientific expertise was necessary to obtain specialized expertise, here Mr. Fink testified on behalf of Midland that he was satisfied with his preexisting sales arrangement.[4]

4. Mr. Fink's testimony was as follows:
 [W]e had a very good going business in those territories. We didn't seek out Noble or Cooper. They sought us out.

 We were happy with the business we were doing and when we negotiated and contemplated opening these warehouses, I was very much concerned that this

Midland established an entity separate and apart from its own business, even though Linark and ABS were to handle customers previously contacted by territory salesmen. As the district judge noted in his closing remarks at the end of the trial, Midland participated more because of an interest in Linark's and ABS's anticipated 35 per cent markup than because of anticipated direct profit from selling inventory to Linark and ABS.[5] We agree that Midland's advances were to equity and motivated by investment reasons. Thus they were capital assets and the taking of an ordinary deduction in the tax years involved would be improper.

Affirmed.

would not result in a diminishing of the profit that Midland was already making in those territories . . . . [O]ne of the terms, one of the conditions I insisted on with both of these so-called managers, was the fact that Midland could terminate within five days the arrangement that was contemplated at any time that it so desired.

5. The district judge's closing remarks were as follows:

Now, I cannot attach much significance to the position that they were interested only in getting the hidden profit in the quote, cost unquote figure, because it was obvious that they expected to get something like a thirty-five per cent markup over the cost plus five per cent and it would be out of that that they were to get, were presumably going to get some profit out of that. If no one expected that profit to materialize, there would have been no purpose in setting up the business. Certainly, it's difficult to believe that the other parties would have gone into these businesses not expecting there to be any profit except that which was in the hidden profit in the cost figures. That just doesn't appear logical . . . .