THURMAN L. PITTS AND ANN B. PITTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
PITTS v. COMMISSIONER
Docket No. 8819-75.
United States Tax Court
T.C. Memo 1978-469; 1978 Tax Ct. Memo LEXIS 42; 37 T.C.M. (CCH) 1849-3; November 27, 1978, Filed *42 Petitioners began negotiations to lease the building housing their wholly-owned corporation's furniture business. They had an offer to lease in early April and signed the lease in May. The lease required them to vacate by August 31. A going-out-of business sale was commenced in early June. On July 19, petitioners' creditors took over the corporation, took an inventory count which showed missing inventory, and continued the liquidation. The corporation also maintained an account for advances made by petitioners to the corporation. The advances provided for no interest, no due date, and no collateral. Held, the amounts advanced by petitioners and recorded by the corporation as loans were in substance contributions to capital; accordingly, subsequent distributions to petitioners were not loan repayments but taxable dividends. Held,further, the corporation had a plan of liquidation in early April; distributions prior thereto are taxable as dividends and distributions thereafter are taxable as liquidating distributions under I.R.C. section 331.Held,further, amount of inventory missing as determined by respondent sustained. Held, *43 further, missing inventory was constructively received by petitioners. Lauch M. Magruder, Jr., for the petitioners. Thomas R. Thomas, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency of $19,042.95 in petitioners' income tax for 1969. The issues to be decided are as follows: (1) Whether certain debits made by petitioners' wholly-owned corporation to an account *44 payable to petitioner Thurman L. Pitts are distributions of property or loan repayments; (2) whether distributions of property by the corporation to petitioners constitute dividends or are distributions in liquidation of the corporation; and (3) the amount of unaccounted for inventory, and whether petitioners should be treated as having received that inventory, if any. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Thurman L. Pitts (hereafter Thurman) and Ann B. Pitts, husband and wife, filed their joint Federal income tax return for the year 1969 with the Internal Revenue Service Center at Chamblee, Georgia. Petitioners resided in Jackson, Mississippi at the time their petition herein was filed. On February 14, 1964, petitioners purchased for $200,000 all of the issued and outstanding stock of Sid Jones, Inc., which was renamed Thurman L. Pitts Interiors, Inc. (hereafter the Corporation), a retail furniture and decorating business, from Sidney and Elizabeth Jones. At the same time, petitioners also purchased the building which housed *45 the Corporation's business and leased it to the Corporation. The Corporation used the fiscal year February 1 through January 31. The Corporation was very informal in its conduct of business. It seldom had formal meetings of its directors or stockholders nor did it prepare minutes of meetings which were held. The Corporation was largely unprofitable during the five years it was owned by petitioners. The Corporation maintained an account, No. 220, entitled "Accounts Payable T. L. Pitts." This account was considered by petitioners to represent amounts owed them by the Corporation for loans made by Thurman. Thus, credits to the account were considered to reflect "loans" made by Thurman and debits (distributions) to this account were considered to be repayments of the "loans." The Corporation, however, issued no notes to petitioners for amounts placed in the accounts, no interest was required to be paid, and no schedule for repayments was set. Petitioners relied solely upon the Corporation's earnings to recover these loans. The only debit shown in the account in January 1969 was in the amount of $921. However, the ledger sheets show a credit balance on February 1, 1969 of *46 $150,085.09, $11,825.38 less than the January 31, 1969 balance of $161,910.47. The January 31, 1969 certified financial statements of the Corporation showed a balance of $150,085.09. Total debits to this account for the period February 1, 1969 to June 19, 1969 were $33,310.42, and credits during that period were $5,600. Debits to the account were $626.91 in February and $24,352.64 in March. The remainder of the debits were made subsequent to April 7, 1969. Twenty-two thousand five hundred dollars of the March debit was made on March 26, 1969, when the Corporation executed a promissory note personally guaranteed by the Pitts in the amount of $72,500 payable to the Deposit Guaranty National Bank. This note renewed several existing corporate obligations and a personal obligation of $22,500 owed by Thurman to the bank. On July 3, 1969, $41,219.56 of the Corporation's $72,500 debt was paid to the bank (the Corporation had previously paid $1,725 in May and $1,492.55 in June of which $2,000 constituted principal). Forty thousand dollars of this payment was made by Thurman. Thurman was in poor health during 1969 and in late March 1969 began negotiations for the lease of the building *47 housing the Corporation's business. Petitioners originally wanted only to curtail the Corporation's business. They hoped to keep half of the building to provide for the Corporation's remaining needs and lease the remaining half. However, the potential lessee desired to lease the entire building and petitioners agreed. On April 7, 1969, Kilgore Fabrics, Inc., sent a letter to petitioners setting forth the proposed terms of the lease. On May 23, 1969, petitioners entered into a ten-year lease with Kilgore Fabrics, Inc., to lease the entire building commencing September 1, 1969, and incorporating the terms set forth in the April 7 letter. The agreement pursuant to which petitioners had purchased the Corporation from Sidney and Elizabeth Jones provided that the Corporation could not be liquidated without the written consent of the Joneses. [1] Petitioners never received such written consent.However, Jones was made aware of petitioners' intention to liquidate, and in a letter dated June 11, 1969, Jones' attorney demanded immediate payment of all amounts outstanding from the original sale by the Joneses to petitioners due to the plan of liquidation in violation of the sales agreement. *48 In early June, a going-out-of-business sale was begun by the Corporation and petitioners discounted most of the store's merchandise from 20 to 40 percent. Prior to this sale, no discount had been made. In June 1969, the Corporation was placed in receivership for the benefit of creditors and liquidated prior to the end of the year. Jones was the prime mover in the receivership action since he held a lien on the corporate assets and was a large creditor of petitioners. He apparently took over the Corporation to protect his interests during liquidation. Jones was not, however, a creditor of the Corporation. The business of the Corporation was concluded by July 23 by selling those assets not returned to the Corporation's creditors and by paying those few creditors who insisted upon full payment. Most creditors had previously agreed to accept payment of 50 percent of the amount due in order to prevent full legal proceedings. Petitioners were forced to resign as directors and officers of the Corporation by their creditors on June 19, 1969. James Spencer, Christine Hogg (the Corporation's accountant) and James Young *49 were thereupon elected to replace petitioners as directors.Hogg, a CPA, had been previously hired by petitioners to audit the Corporation's financial statements for its fiscal year ending January 31, 1969. She had also prepared both the Corporation's and petitioners' personal income tax returns for several years prior to and including 1969. Petitioners were also required to assign the right to vote the Corporation's stock to Spencer and Hogg. The new board of directors directed the taking of an inventory of the merchandise of the Corporation at its expense and in a manner to be approved by Hogg. Hogg was also directed by the board of directors to do whatever was necessary to have the Corporation's books, records and accounts brought up to date by the most expeditious means possible so that its present financial condition could be ascertained. For the Corporation's fiscal year beginning February 1, 1969, the Corporation's books and records included a cash disbursements journal and a cash sales journal. Hogg programed these records into a computer and prepared a computer print-out which respondent used to determine sales and purchases. Typically, the retail list price of petitioners' *50 merchandise was determined by doubling its cost to petitioners, including freight costs. When petitioners inventoried items, they did not use the original invoices but rather counted each item in the store, and reduced by 50 percent the list price on the item to determine its value. The accountant who certified the Corporation's books would spot check items throughout the store. Petitioners used their home as a display facility for the Corporation and kept furniture there valued at between $7,500 and $8,000. The Corporation sold items from their home and such items were billed through the Corporation as though it were sold from the store. However, the furniture was not included in the Corporation's inventory account. On January 31, 1969, the Corporation's inventory was valued at cost at $271,673.80. Respondent valued the remaining inventory on June 19 at cost at $195,253.94 based on the June 19 inventory taken by Hogg.From February 1 to June 19, the Corporation had total reported sales of $80,908.04 representing cost of goods sold of $40,454.02. Total purchases recorded by the Corporation during this period amount to $63,132.59. Thus, respondent determined that there remained *51 unaccounted for inventory valued at cost of $99,098.43. [2] Figures supplied by Hogg to respondent showed that of the $195,253.94 in inventory as of June 19, 1969, $10,105.62 (at cost) was returned by the Corporation to its sellers and the remaining $185,148.32 was sold for $173,250.05 during the period June 19, 1969, through final closing on July 23, 1969. There was no evidence of theft which could account for the missing inventory. ULTIMATE FINDINGS OF FACT 1. Amounts advanced by Thurman to the Corporation and credited by the Corporation to Thurman in account number 220 were not loans, but represented capital contributions. 2. The Corporation adopted a plan of liquidation as of April 7, 1969. 3. The Corporation's inventory shortage as of June 19, 1969 represents inventory items which were either taken by petitioners or sold with the proceeds retained by petitioners. OPINION Respondent determined that during 1969 petitioners received money *52 and other property from their wholly-owned Corporation, and that such receipts constituted distributions of earnings of the Corporation, taxable as dividends under sections 301 and 316. [3] Petitioners contend that withdrawals from the Corporation, represented by debits against the account payable to Thurman on the Corporation's books, amounted to nontaxable loan repayments and were not taxable capital distributions. Petitioners also contend that the Corporation adopted a plan of liquidation on or prior to March 26, 1969, and, therefore, any distributions to them which are not considered loan repayments should be treated as liquidating distributions taxable under the provisions of section 331. [4]
1. Whether distributions from account No. 220 were taxable distributions of property or non-taxable repayments of loans. Respondent contends that contributions made by petitioners *53 to the account were not loans but rather represented capital contributions. The issue presents a factual question to be determined upon consideration of all the facts and circumstances present in the case. Initially, we note that although the corporate books treat the account as a shareholder loan, the characterization of the contributions and withdrawals on the corporate books in not controlling since books entries and records may not be used to conceal the true situation. Gregory v. Helvering,293 U.S. 465 (1935). Midland Distributors, Inc. v. United States,481 F. 2d 730 (5th Cir. 1973). Moreover, while petitioners may well have intended that these advances be considered as loans, objective criteria control their characterization, not subjective intent. Smyers v. Commissioner, 57 T.C. 189, 196 (1971). Since the Corporation was wholly owned by petitioners, *54 the transaction should be carefully scrutinized. The following factors clearly indicate that the contributions by petitioners were not loans to the Corporation: (1) There were no certificates by indebtedness, simply entries on the corporate books. Smyers v. Commissioner,supra.
(2) There was no maturity date; rather, the advances were made on open account. Smyers v. Commissioner,supra;Marco S. Marinello Associates, Inc. v. Commissioner,T.C. Memo. 1975-78, affd. 535 F. 2d 147 (1st Cir. 1976). Petitioners used their control of the Corporation to withdraw whatever funds they desired at whatever time and in whatever amounts they chose. Meyer v. Commissioner,45 B.T.A. 228, 239 (1941). (3) No interest was charged to the Corporation. Smyers v. Commissioner,supra;Saigh v. Commissioner,36 T.C. 395 (1961). (4) Petitioners were engaged full time in the management operation of the corporation, and there was a complete identity of interest between creditor *55 and shareholder. Smyers v. Commissioner,supra. Thus, the decision to enforce payment rested in the same person who was obligated to repay the amount. Cf. Baird v. Commissioner,25 T.C. 387 (1955). (5) Petitioners were relying on the Corporation's earnings to recover the contributions; advances made subject to the fortunes of a venture such that full payment could not be expected unless the Corporation made a profit indicate an equity interest. Midland Distributors, Inc.,supra;Dillin v. United States,433 F. 2d 1097 (5th Cir. 1970). Because the amounts advanced to the Corporation constituted an equity interest, debits made to account No. 220 must be considered to be withdrawals by the petitioners, taxable under sections 301 and 316 unless considered to be payments made in liquidation of petitioners' stock and taxable under section 331, as discussed and resolved hereinafter. A further issue was raised by petitioners concerning the $22,500 debited to the account on March 26, 1969. Respondent contends that this amount was a cash distribution by the Corporation to petitioners and that petitioners have not shown *56 otherwise. In our findings of fact, however, we found that the $72,500 note executed by the Corporation to the Deposit Guaranty National Bank renewed several existing corporate obligations and a personal obligation of $22,500 Thurman owed to the bank. In the present situation, the Corporation made payments on the note of $1,725 in May and $1,492.55 in June. In July, Thurman then paid out of his personal funds $40,000 of the $41,219.56 paid in respect of the Corporation's obligation to the bank. Under these particular circumstances, we believe that Thurman should not be considered to have received any distribution as a result of the Corporation's assumption of his obligation. When Thurman paid the $40,000, it cannot be doubted that he effectively repaid his own obligation. To hold otherwise would be to create a taxable distribution to petitioners upon Thurman's paying the note, a result which we feel would be harsh and unwarranted on the facts of this case. [5]
Finally, *57 we must deal with the further question of whether petitioners received additional distributions in January 1969 of $11,825.38. The Corporation's ledger sheets showed a credit balance in account No. 220 on February 1, 1969 which was $11,825.38 less than they showed on January 31, 1969. Respondent argues that this amount was distributed to petitioners. Petitioners contend the reduction resulted from an adjusting journal entry correcting a bookkeeping error which occurred in the Corporation's fiscal year ending January 31, 1969. Petitioners also argue that the proposed finding by respondent was not at issue in the notice of deficiency and that it should not be considered by this Court. Cf. Goldsborough v. Commissioner, 70 T.C.     (1978). We do not reach this latter contention made by petitioners, for we believe the weight of evidence supports their initial position. The January 31, 1969, certified financial statement showed a balance of $150,085.09, the amount shown on the ledger sheets at February 1, 1969, and the reduction was probably the result of an adjusting entry. Moreover, it is likely that the adjusting entry was a correction of a bookkeeping entry erroneously *58 recorded in calendar year 1968, and that even if considered a debit, it would be a debit in 1968, a year not in issue. 2. Did the Corporation adopt a plan of liquidation? Petitioners contend that any taxable distributions made to them by the Corporation on or after March 26 were distributions in liquidation of the Corporation and taxable under section 331(a)(1). Respondent contends that the Corporation never had an intent to liquidate or that if it had such an intent, it was not formed prior to the June 19, 1969 takeover by creditors.
Whether distributions by a corporation are made while in the process of liquidation is a question of fact, Transportation Service Associates, Inc. v. Commissioner,149 F. 2d 354 (3d Cir. 1945), and this Court has applied a three-pronged test to determine this issue: (1) there must be a manifest intention to liquidate; (2) there must be a continuing purpose to terminate corporate affairs; and (3) the corporation's activities must be directed to such termination. Estate of Maguire v. Commissioner,50 T.C. 130, 142 (1968). *59 See also Genecov v. Commissioner,412 F. 2d 556 (5th Cir. 1969); Beretta v. Commissioner,141 F. 2d 452 (5th Cir. 1944), cert. denied 323 U.S. 720 (1944); Kennemer v. Commissioner,96 F. 2d 177 (5th Cir. 1938), affg. 35 B.T.A. 415 (1937). We note that although there is nothing in the corporate records to indicate a plan to liquidate, this absence is not dispositive, especially in light of the informal manner in which the Corporation conducted its business. Genecov v. Commissioner,supra;Beretta v. Commissioner,supra;Cleveland v. Commissioner,39 T.C. 657 (1963); affd. 335 F. 2d 473 (3d Cir. 1964). Highly persuasive support for petitioners' testimony that they formed an intent to liquidate in late March is the fact that petitioners began negotiations to lease the building that housed the Corporation's business in late March and received a firm offer to lease on April 7 which stated that the new lessee desired to lease as soon as possible. Petitioners did not continue searching for a new lessee afterward and accepted the terms *60 set forth in the April 7 offer. Moreover, the Corporation was largely unprofitable and Thurman was in poor health. To determine whether the Corporation's activities were directed toward bringing about the termination of the affairs of the Corporation after the adoption of a plan to liquidate, we must look to the corporate activities after the plan's adoption. We believe that when petitioners commenced looking for a new lessee they not only evidenced their intent to liquidate but also took the first step in bringing about the termination of the Corporation's business. Cf. Horn and Hardart Baking Co. v. United States,34 F. Supp. 89 (E.D. Pa. 1940). Petitioners desired to lease the building immediately, obtained a firm offer to lease soon thereafter, and in fact entered into a lease agreement two months after they started searching for new lessees. Furthermore, the lease provided petitioners with only enough time to liquidate their stock and they started a going-out-of-business sale in early June, soon after the lease was signed. Although standing alone the mere fact of entering into the lease would not be conclusive evidence that a plan was adopted, there *61 is nothing in the record that even suggests that petitioners attempted to find a new location to house the business. Moreover, since petitioners owned the building which was leased to the Corporation and in fact purchased it for that purpose, it is highly unlikely they would lease it to another business and at the same time look for a new building for the Corporation to lease. While we believe that petitioners formed an intent to liquidate the Corporation sometime in late March 1969 and took the first step toward liquidating at that time, we do not believe that a firm commitment to liquidate was reached before April 7, when petitioners knew they could lease the building. This is especially true in light of the fact that petitioners originally desired to lease only half the building but decided to liquidate completely only upon learning the lessee's desire to lease the entire building. Respondent argues that petitioners continued to make purchases of inventory after late March and that such purchases preclude a finding that the Corporation was in liquidation. We disagree. Only if the *62 new business is neither a minor transaction nor incidental to the liquidation would the purchases be evidence of a corporate intent to continue its business. Cleveland v. Commissioner, supra;R. D. Merrill Co. v. Commissioner,4 T.C. 955 (1945); Rollestone Corporation v. Commissioner,38 B.T.A. 1093 (1938). The facts here indicate that petitioners intended to liquidate the Corporation.After the adoption of the plan, petitioners knew they would have only a limited time in which to sell the newly purchased inventory and we do not wish to substitute our judgment as to whether such purchases constituted sound business.As long as petitioners believed they could sell the additional items before they had to vacate the building, such purchases would be incidental to the liquidation since a corporation in liquidation may engage in business for profit. Estate of Maguire,supra at 143. On these facts, we believe that liquidation of the Corporation commenced April 7, 1969, and we have so found. Respondent also relies on the sales contract between Jones and petitioners which expressly prohibited the liquidation of the Corporation *63 without Jones' prior written consent to support his contention that the Corporation could not liquidate even if there were an intent to do so. We do not find this factor to be important. Jones was aware that petitioners intended to liquidate. The plan of liquidation caused all outstanding loans owed by petitioners to Jones to become immediately due, and in early June, Jones' attorney demanded payment. In fact, it appears that the primary reason Jones took over the Corporation was to protect his interests during the liquidation process. Respondent also contends that because petitioners were withdrawing money and property from the Corporation prior to June 19, in disregard of the rights of creditors, there could be no plan of liquidation. Although the record supports respondent's position that petitioners did receive corporate assets in violation of state law protecting creditors, this argument misses the point. Even assuming that petitioners were "looting" the corporate assets, this does not mean that they were not trying to liquidate the Corporation. The evidence indicates that they were trying to sell or remove all the Corporation's assets and terminate its business and this *64 suffices for purposes of section 331. What legal rights may have been created in the creditors because of the alleged "looting" does not alter this result. Respondent next argues that even if a plan to liquidate was established, the continuity of such plan was terminated with the taking over of the Corporation by creditors and that there can be no liquidation where there is no continuing purpose to terminate activities, relying on Estate of Maguire,supra. We find this argument also without merit. Jones took over the Corporation to protect his investment during the liquidation. This is not a situation in which a corporation or its shareholders had a change of heart in the middle of a liquidation and later decided not to liquidate. The subsequent events in this case show clearly that there was no change in the decision to terminate the Corporation's business. We have found that the Corporation adopted a plan to liquidate as of April 7, 1969, and accordingly, we hold that amounts distributed by the Corporation to petitioners (through debits to account No. 220 and otherwise) prior to that date are taxable under section 301 and 316 and amounts distributed subsequent to *65 such date are taxable under section 331. 3. Unaccounted for inventory. Respondent contends that the missing inventory constitutes a constructive distribution to petitioners because it was either removed by petitioners from the Company's premises and converted to their own use or was sold by petitioners who received the purchase price and then failed to report the sales. Petitioners contend not only that they did not receive any missing inventory but that the inventory count taken on June 19 by Hogg was inaccurate and understated and that there was little, if any, actual inventory shortage before June 19. Specifically, petitioners make the following claims: (1) the cost of samples valued at approximately $15,000 to $20,000 was not included in the inventory; (2) there was no adjustment made to reflect the 20 to 40 percent reduction in tag price caused by the sale which was taking place on the date of take-over by the creditors; and (3) the cost of purchases used in computing the cost of merchandise available for sale was greatly overstated due to the fact that approximately $21,000 to $27,000 of what respondent determined to be the cost of purchases related to purchases *66 of inventory made prior to the fiscal year beginning February 1, 1969. As further support for their contentions, petitioners state that it would have been impossible to sell the $185,148.32 of inventory respondent claims was available for sale on June 19 in five weeks before closing on July 23 for the $173,250.05 received by the Corporation. We have carefully reviewed the evidence and conflicting testimony of the witnesses and we do not believe that petitioners have substantiated any of their objections to respondent's computation of missing inventory. Petitioners' claim that the Corporation could not have sold the remaining inventory at 90 percent of cost in five weeks is contradicted by their own actions. Had Jones not taken over the Corporation in June, petitioners would have had only until August 31 (the day before commencement of the lease to Kilgore Fabrics Inc.), to sell inventory which by their own calculations must have been valued (at cost) at over $50,000 more than respondent contends was on hand on June 19. Yet, the going-out-of-business sale was not started until June and price reductions were only 20 to 40 percent of retail prices. In fact, petitioners continued *67 making purchases through June, and although we determined that such purchases were incidental to the liquidation, we note that even using petitioners' computations, the amount of purchases nearly equalled the cost of goods sold. Although not entirely free from doubt, we must also uphold respondent's determination that petitioners must be deemed to have received the inventory. The burden of proof is, of course, on petitioners to show that they did not receive the inventory although the burden on a taxpayer to disprove the negative that income was not received is less exacting than the burden to prove other facts. Cf. Weir v. Commissioner,283 F.2d 675, 679 (6th Cir. 1960). We have weighed petitioners' credibility with the fact that there was no evidence of theft which would explain the discrepancy. In the computations contained in the notice of deficiency, respondent in effect allocated the missing inventory to petitioners on a monthly basis. Under the circumstances presented in this case, we believe that such an allocation is reasonable and proper. Thus, amounts deemed *68 received by petitioners prior to April 7 constitute distributions taxable under sections 301 and 316. Distributions deemed to be made after April 7 must be considered distributions in liquidation of the Corporation and taxable under section 331. Decision will be entered under Rule 155.
Footnotes
1. Hereafter references to Jones are to Sidney Jones.↩
2. ↩
Value of inventory 1-31-69
$ 271,673.80
Cost of purchases 2-1 to 6-19
63,132.59
Cost of goods sold 2-1 to 6-19
(40,454.02)
Value of remaining inventory
(195,253.94)
Missing inventory
$ 99,098.43
3. All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable year in issue. ↩
4. In general, section 331↩ treats amounts received by a stockholder in liquidation of a corporation as received in exchange for his stock, i.e., taxable as a capital gain or loss.
5. It follows that petitioner would not be entitled to an increase in the basis of his stock for $22,500 of the $40,000 which he paid on the note, since to that extent he was paying his own obligation.↩