LDS, INC., TRANSFEREE OF THE ASSETS OF GLEN-TERRA, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
LDS, Inc. v. Commissioner
Docket No. 16839-84.
United States Tax Court
T.C. Memo 1986-293; 1986 Tax Ct. Memo LEXIS 318; 51 T.C.M. (CCH) 1433; T.C.M. (RIA) 86293; July 15, 1986. Robert A. Wherry, Jr., for the petitioner. *319 Michael Cooper, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent has determined that LDS, Inc., petitioner, is liable as transferee for income tax deficiencies in the amounts of $2,481 and $305,327 of Glen-Terra, Inc. and subsidiaries for the taxable years ended December 31, 1977, and July 12, 1979, respectively. The parties have resolved certain adjustments and the only one remaining in dispute is an increase, determined by respondent, in the amount of $521,781 in the taxable income of Glen-Terra, Inc., and subsidiaries for the taxable year ended July 12, 1979. The correctness of respondent's determination turns on the following issues: 1. Whether the transfer by Glen-Vista, Inc., to Glen-Terra, Inc., of 7,090 acres of land on October 29, 1971, in exchange for a "note" was a sale or a nontaxable capital contribution. 2. Whether the extinguishment of the "note" as a result of a section 332 [1] liquidation of Glen-Vista, Inc., into Glen-Terra, Inc., was a "disposition" of the note within the meaning of section 453(d), as then in effect. *320 FINDINGS OF FACT At the time the petition was filed, petitioner's principal place of business was located in Colorado Springs, Colorado. For 1971, 1972, and 1973, Glen-Terra, Inc. (hereinafter Terra), and Glen-Vista, Inc. (Vista), each filed Federal corporate income tax returns. For each of the calendar years 1974 through 1978 and for the short taxable year ended July 12, 1979, Terra and its subsidiaries, including Vista, filed consolidated Federal income tax returns with the Internal Revenue Service. In the early 1970's, Thomas Glennon (Glennon) was interested in investing in, promoting, and developing real estate. On March 3, 1970, Glennon and others incorporated Vista with an initial capitalization of $10,000. Glennon contributed $5,000 and received 5,000 shares; M. H. Brinkerhoff contributed $2,500 and received 2,500 shares; and G. E. Stevens and H. S. Harmon each contributed $1,250 and each received 1,250 shares. On March 9, 1970, Glennon entered into a contract with Robert E. Richards (Richards), an unrelated party, for the purchase of approximately 8,475 acres of land (the Fremont Land) for $400,000. On or before March 31, 1970, Glennon assigned his contract with *321 Richards to Vista and Vista completed the contract. Between March 31, 1970, and February 10, 1971, a dispute arose between Glennon, who wanted Vista to enter the "retail land business" and sell the Fremont Land in small lots, and the other shareholders, who wished to sell the Fremont Land in tracts of 40 acres or more. On February 10, 1971, Glennon resigned as president of Vista and organized Glen-Delco Corporation, which later changed its name to Terra and will hereinafter be so identified. The initial capitalization of Terra was $100, all of which was contributed by Glennon in exchange for 100 shares of common stock. From February 11, 1971, through July 12, 1979, Terra had only 100 shares of stock outstanding. On or about February 12, 1971, Vista executed an option agreement which was designed to permit Terra to acquire parcels of Fremont Land from Vista to be sold in small 5-acre lots in Terra's retail land business. Some of the land was sold under this arrangement. On April 1, 1971, Glennon transferred his 100 shares of Terra stock and his 5,000 shares of Vista stock to his wife, Lillian Glennon (Mrs. Glennon). On July 1, 1971, G. E. Stevens transferred 625 shares of *322 Vista's common stock to Zack Brinkerhoff, Jr. On September 16, 1971, Vista's stock has owned as follows: Shareholder
No. of Shares
Zack H. Brinkerhoff, Jr.
625
G. E. Stevens
625
H. S. Harmon
1,250
M. H. Brinkerhoff
2,500
Mrs. Glennon
5,000
Total Issued and Outstanding Shares
10,000
On September 16, 1971, Vista agreed to redeem all of its stock not owned by Mrs. Glennon for $100,000 and 320 acres of the Fremont Land, which then had a value of about $75 per acre, to be selected by the redeemed shareholders. The redemption agreement was closed on September 27, 1971. On that date, Glennon was again elected president of Vista, and he held that position until July 11, 1979, when he resigned. On October 29, 1971, Vista agreed to convey to Terra the remaining Fremont Land (the acreage not previously sold or transferred to Vista shareholders in redemption of their stock), consisting of approximately 7,090 acres.In this connection, Terra executed a note, payable to Vista, the body of which is as follows: IN INSTALLMENTS after date, for value received, the undersigned, jointly and severally, promise to pay to the order of GLEN VISTA, INC. *323 at Denver, Colorado ONE MILLION FIVE HUNDRED NINETY EIGHT THOUSAND NINE HUNDRED FIFTY THREE AND 50/100 DOLLARS payable in installments with interest at 6 percent per annum on the declining balance. IT IS AGREED by the makers and endorsers hereof that if this note is not paid when due or declared due hereunder, the principal and accrued interest thereon shall draw interest at the rate of 10 percent per annum, and that failure to make any payment of principal or interest when due or any default under any encumbrance or agreement securing this note shall cause the whole note to become due at once, or the interest to be counted as principal, at the option of the holder of the note. * * * This transaction was reported on a schedule attached to Vista's calendar year 1971 Federal income tax return as an installment sale for a selling price of $1,598,953 and a gain of $1,299,887 on the sale (ratio of gain to contract price of .8130). The Fremont Land was transferred from Vista to Terra by a series of deeds over a period of about 18 months. No downpayment was made and no security was given for the note. On Vista's and Terra's records, the amount of the purchase price was corrected *324 to $1,604,683.50. Terra had no source of funds for payment of the note except land sales. As sales of Fremont lots were made and the proceeds of the sales were collected, Terra made sporadic payments to Vista with respect to the unpaid balance of the note, together with interest thereon as follows: Unpaid
Principal
Amount
"Interest"
"Interest"
Principal
Balance at
Period
Paid
Paid
Balance
Paid
End of Period
10/29/71 --
12/31/71
$15,990
$1,604,683
1/ 1/72 --
12/31/72
41,003
41,003
70,927
1,604,683
1/ 1/73 --
12/31/73
166,867
1,604,683
1/ 1/74 --
12/31/74
643,537
262,807
380,730
1,223,953
1/ 1/75 --
12/31/75
73,440
1,223,953
1/ 1/76 --
12/31/76
371,880
146,880
225,000
998,953
1/ 1/77 --
12/31/77
367,506
59,940
307,566
691,387
1/ 1/78 --
12/31/78
691,387
1/ 1/79 --
7/11/79
49,514
63,583
49,514
641,873
Totals
$1,473,440
$510,630
$962,810
On December 31, 1973, Mrs. Glennon transferred her 5,000 shares of Vista stock to Terra. In 1974 and in 1976 Terra formed two new subsidiary corporations, Estates and Properties, respectively. *325 The two new corporations as well as Terra sold the Fremont Land to the public in lots as "ranchettes." Vista's Federal income tax returns for 1972 through 1979 (including the returns of Terra and subsidiaries) reported gain from the sale of the Fremont Land and included it in income. The Federal income tax paid by Vista, Terra, and subsidiaries for the taxable years ended December 31, 1971 through July 12, 1979, was approximately the same amount of tax as would have been paid by Vista, Terra, and subsidiaries (ignoring the Federal income tax on the $521,781 at issue in this case) had such transaction been treated as a capital contribution rather than as a sales transaction. On July 11, 1979, Vista, Properties, and Estates were liquidated into Terra pursuant to section 332. At the time of Vista's liquidation, its basis for Federal income tax purposes in the unpaid balance of the note was $120,092, and the remaining "deferred gain," computed under section 453, as shown on Vista's financial records was $521,780. As part of the liquidation, Vista transferred the note to Terra. Terra's basis in the assets received from Vista was determined for Federal income tax purposes under *326 section 334(b)(1). On July 12, 1979, the Glennons transferred all of Terra's outstanding stock to petitioner. On the same date, Terra adopted a plan of liquidation whereby its assets were transferred to petitioner. To reflect the liquidation of Vista and Terra, and to close the books for tax computation purposes, a journal entry was made to reflect a reduction in Terra's tax basis in the remaining Fremont Land in the amount of $521,780.79. Prior to the transfer, LDS and its shareholders were unrelated to Terra and the Glennons. OPINION Respondent contends that, on October 29, 1971, Vista sold land to its sister corporation and received a note which it elected on its 1971 return to treat as an installment obligation under section 453. In 1973, Vista became a wholly owned subsidiary of Terra and, in 1979, Vista was liquidated into Terra. As a result of the merger of debtor and creditor, the note was extinguished and, according to respondent, this extinguishment of the note was a section 453(d) "disposition" of the installment obligation. This disposition of the installment obligation caused the gain deferred as a result of the section 453 election to become taxable. Accordingly, *327 Terra became taxable on deferred gain in the amount of $521,781 remaining on the unpaid balance of the note and petitioner is liable for such tax as transferee of Terra. Petitioner concedes that it is a transferee of Terra but denies that Terra incurred any tax as a result of the extinguishment of the liability on the October 29, 1971, note. Petitioner contends that, although the documents relating to the transfer of the Fremont Land from Vista to Terra used the terminology of a sale, the transaction was in substance and in fact a capital or equity contribution to Terra. Under this view of the transaction, the provisions of section 453 never came into play and petitioner incurred no transferee liability when it received Terra's assets in the July 12, 1979, liquidation. We hold for petitioner. Preliminarily, respondent maintains that petitioner is foreclosed from contending that the Vista-to-Terra land transfer was a capital contribution by the doctrine of Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134 (1974). In that case the Supreme Court stated that it had "observed repeatedly that, while a taxpayer is free to organize his affairs *328 as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." 417 U.S. at 150. This is, of course, the general rule. The issue here, however, is the substantive character of the interest created by the Vista-to-Terra land transfer, i.e., a debt or an equity interest. Petitioner is simply arguing that the legal conclusion to be drawn from the objective facts is that, notwithstanding the labels attached, the transfer of property from Vista to Terra was in substance a capital contribution.This argument is not subject to the National Alfalfa rule. In Selfe v. United States,778 F.2d 769, 774 (11th Cir. 1986), the court of appeals recently explained the distinction as follows: Although the question whether a stockholder's advances to a corporation constitute debt or capital contributions is usually raised by the government, nothing in the Internal Revenue Code or our decisions suggests that the factors used to determine the substantive character of a taxpayer's interest in a corporation *329 are available only to the government. See In re Lane, 742 F.2d at 1315; cf. Peter E. Blum,59 T.C. 436, 439 (1972) (principles of resolving debt-equity determinations are consistent regardless of the context in which such determinations arise); J.A. Maurer, Inc.,30 T.C. 1273 (1958). Accordingly, where the nature of a taxpayer's interest in a corporation is in issue, courts may look beyond the form of the interest and investigate the substance of the transaction. These situations present an exception to the general proposition that a shareholder/taxpayer is bound by the form of her transaction. See Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 795-96 (1975). In Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 795 (1975), cited above by the court of appeals, this Court stated that "while a taxpayer must in other contexts accept the tax consequences of the way in which he deliberately chose to cast his transaction," the determination of whether advances to a corporation are loans or equity contributions depends on the "economic reality for the year at issue." Accordingly, we must determine *330 the economic realities of the Vista-to-Terra transfer of the Fremont Land. Articulating the difference between an installment sale and a capital contribution of property to a corporation is no easy task. The problem is particularly difficult in the case of close corporations such as Vista and Terra, because the participants have broad latitude to cast their transactions in whatever form they choose and label them with terms not always consistent with economic realities. The courts have repeatedly stated, however, that "the labels that parties attach to their transactions provide no guarantee of the appropriate tax treatment." Slappey Drive Ind. Park v. United States,561 F.2d 572, 581 (5th Cir. 1977); see also Tyler v. Tomlinson,414 F.2d 844, 850 (5th Cir. 1969). The decisive factor is not the terminology used in the documents but the economic substance of the transaction. In determining whether a particular transaction creates a debt or an equity interest, the courts have considered a long list of factors, including: (1) the label given the instrument; (2) the presence or absence of a fixed maturity date; (3) the source of payments thereon; *331 (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to other creditors; (7) the intent of the parties; (8) "thin" or inadequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the transferee corporation to obtain loans from outside lending institutions; (12) the extent of the transferee corporation's other capital assets; and (13) the failure of the debtor to repay the loan on time or seek a postponement. Texas Farm Bureau v. United States,725 F.2d 307, 311 (5th Cir. 1984); Fin Hay Realty Co. v. United States,398 F.2d 694, 696 (3d Cir. 1968); see McSorley's, Inc. v. United States,323 F.2d 900, 901-902 (10th Cir. 1963). These various factors are not equally significant."The object of the inquiry is not to count factors, but to evaluate them." Tyler v. Tomlinson,414 F.2d 844, 848 (5th Cir. 1969). [2]
*332 In the instant case, Terra was organized on February 10, 1971, with a capital of only $100 for which it issued 100 shares of its stock. This capitalization was obviously insufficient to permit it to engage in any substantial business activity or borrow money from outside sources. To become a viable entity, it needed capital. See Estate of Mixon v. United States,464 F.2d 394, 410 (5th Cir. 1972). To obtain that capital, Terra's owner turned to Vista, a sister corporation. [3]
*333 On October 29, 1971, only a few months after Terra was organized, Vista transferred to Terra 7,090 acres of the Fremont Land, without any downpayment, in consideration for a purported purchase price note of $1,598,953. As suggested above, the fact that the consideration was in the form of a note has little significance in determining the substance of the transaction. Terra's income, if any, between February 10, 1971, and October 29, 1971, was minimal, and its 1971 income tax return shows a loss of $30,289 for that calendar year. If the note was to be paid the this thinly capitalized new corporation, it could be paid only from profitable future sales of the Fremont Land itself. "If payment to the transferor is dependent solely upon the success of an untried, undercapitalized business, the prospects of which are uncertain, the transfer of property raises a strong inference that it is, in fact, an equity contribution." Burr Oaks Corp. v. Commissioner,43 T.C. 635, 647 (1965), affd. 365 F.2d 24 (7th Cir. 1966); Estate of Mixon v. United States,supra at 404; Aqualane Shores, Inc. v. Commissioner,269 F.2d 116, 119-120 (5th Cir. 1959), *334 affg. 30 T.C. 519 (1958). Although the land was purportedly purchased by Terra in consideration for the note, Vista received no downpayment and took no security for the note in the form of a mortgage or other lien. Rarely is real estate sold at arm's length on such terms. Moreover, the note provided no maturity date or payment schedule. Under Colorado law, the note, if a bona fide obligation, would be treated as a demand note. See Colo. Rev. Stat. 4-3-108 (1973); Thompson v. Hilleweart,137 Colo. 107, 321 P.2d 623, 624 (1958). "While the issuance of a note may evidence bona fide indebtedness, an unsecured note due on demand with no specific maturity date, and no payment [schedule] is insufficient to evidence a genuine debt." Stinnett's Pontiac Service, Inc. v. Commissioner,730 F.2d 634, 638 (11th Cir. 1984), affg. a Memorandum Opinion of this Court. The transfer of the land to Terra was designed to give Terra an inventory of property, the only asset it held, for resale and to give it financial credibility. Glennon testified that one purpose of the land transfer was to strengthen Terra's marketing *335 capabilities by putting "a sizeable asset on the balance sheet," thus facilitating the borrowing of funds and the factoring of commercial paper. The offsetting liability, he testified, could be explained as a debt "owed to the same people on both sides of the transaction." The land transfer thus gave Terra borrowing power which normally would have existed only through the presence of more adequate capitalization. Plantation Patterns, Inc. v. Commissioner,462 F.2d 712, 722-723 (5th Cir. 1972), affg. a Memorandum Opinion of this Court. Because the transfer of the land to Terra was free and clear of any mortgage and Terra could use it as security for loans, Vista's note was in practical effect subordinated to the claims of Terra's creditors. See United States v. Henderson,375 F.2d 36, 40 (5th Cir. 1967). In this manner, the Fremont Land was placed at the risk of Terra's business. Burr Oaks Corp. v. Commissioner,43 T.C. at 647. Ordinarily, "shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." Slappey Drive Ind. Park v. United States,561 F.2d at 581; Midland Distributors, Inc. v. United States,481 F.2d 730, 733 (5th Cir. 1973). *336 At the time of the transfer, moreover, Mrs. Glennon owned all of the stock of both Vista and Terra and thus controlled these brother-sister corporations. This identity of interests meant that collection of the purported note would not be enforced to Terra's detriment. When both the transferor and the transferee are commonly controlled, "the parties' framing of the transaction contributes little to the analysis." Slappey Drive Ind. Park v. United States,561 F.2d at 583; see Fin Hay Realty Co. v. Commissioner,398 F.2d 694, 697 (3d Cir. 1968). We think it also significant that the purported purchase price had no relationship to the Fremont Land's value. Vista bought the land for $400,000, less than $50 per acre, in March 1970, about 18 months before the purported sale. On September 27, 1971, Vista completed the redemption of the stock of all its shareholders except Mrs. Glennon, in part for 320 acres of the land at a value of $75 per acre. One month later, Vista purportedly sold the remaining 7,090 acres for $1,598,953, over $200 per acre. The testimony shows that this purported price was grossly excessive, and an arm's-length sale would not *337 have been made on such terms. Aqualane Shores, Inc. v. Commissioner, 30 T.C. at 526; Burr Oaks Corp. v. Commissioner,43 T.C. at 640. In support of his contention that the Vista-to-Terra transfer was a sale, respondent points out that the note was executed, the transaction was reflected as a sale on the accounting records of Vista and Terra, and the subsequent income tax returns report the payments as gains and interest from the sale, as described in our findings. While these facts tend to show the subjective intention of the individuals who controlled Vista and Terra that the transaction was to be a sale rather than a contribution of capital, they do not stand alone. For example, the deeds, executed over a period of months, when recorded were treated as capital contributions not subject to the full documentary fee. See Colo. Rev. Stat. 39-13-102. Moreover, the sporadic so-called payments on the note resembled dividends in that they appear to have been made only when excess funds were available to Terra and not according to any prearranged schedule. Thus, no payments were made in 1971, 1973, 1975, and 1978; substantial *338 payments were made in 1972, 1974, 1976, 1977, and 1979. At most, the terminology used and the accounting and tax treatment accorded the transaction by Vista and Terra show that the individuals in control of the two corporations subjectively intended the transfer to be sale and that they followed through with that intention in keeping their records and filing their income tax returns. As a minimum subjective intent must be "weighed against the facts which support contrary inferences." McSorley's, Inc. v. United States,323 F.2d 900, 902 (10th Cir. 1963); Crawford Drug Stores, Inc. v. United States,220 F.2d 292, 296 (10th Cir. 1955). In Slappey Drive Ind. Park v. United States,561 F.2d 572, 583 (5th Cir. 1977), the court explained: The question is not whether the parties intended to call their transaction "debt" * * *. Instead, the relevant inquiry is the actual manner, not the form, in which the parties intended to structure their relationship. If the intended structuring accords with the type arrangement that qualifies for taxation as debt, that intent supports a finding of debt. Here, however, the parties intended to structure *339 their relationship in a manner placing funds at the prolonged risk of the businesses; they intended decisions whether to make payments on the advances to be based on the criteria usually associated with dividend decisions. To the extent that intent is relevant, it favors equity classification. [Fn. ref. omitted.] In a number of cases, the courts have held, notwithstanding the form of the documents and the declared intention of the participants, that jury verdicts were not controlling where objective facts, comparable to those discussed above, demonstrated that the disputed transaction was a capital contribution rather than debt, see, e.g., Dillin v. United States,433 F.2d 1097, 1100 (5th Cir. 1970); Berkowitz v. United States,411 F.2d 818, 821 (5th Cir. 1969); cf. United States v. Snyder Brothers Co.,367 F.2d 980, 982-983 (5th Cir. 1966). In this case, in summary, the objective facts overwhelmingly lead to the conclusion that the Vista-to-Terra land transfer was a capital contribution: (1) Terra was a newly organized corporation which had capital of only $100; (2) the transfer provided Terra with its start-up capital, *340 an inventory of land which it could sell; (3) in addition to a sales inventory, the transfer provided Terra with property that it could use as security for the borrowing of funds and enabled it to factor commercial paper and thereby obtain funds for developing the land; (4) if the October 29, 1971, note were treated as a debt, the ratio of debt to other capital was over 15,000 ($1,598,953) to one ($100); (5) the "note" was unsecured and had no maturity date; (6) the note could be paid only from the proceeds of the profitable sale of the land transferred to Terra; (7) in substance Vista's note was subordinate to outside loans obtained by Terra; and (8) Vista and Terra were both owned, controlled, and managed completely by the Glennons, which meant that the note would not be enforced to Terra's detriment. In our opinion these factors constitute "strong proof" that the transaction was a capital contribution, see Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957), and far outweigh the Glennons' subjective intent that the transaction was to be a sale of land to Terra. Accordingly, Vista's transfer of the Fremont Land to Terra *341 was a capital contribution and gain was not recognized when either Vista or Terra was liquidated. We need not, therefore, deal with the parties' argument under section 453. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. See also sec. 385(b) as follows: (b) Factors. -- The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors: (1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest, (2) whether there is subordination to or preference over any indebtedness of the corporation, (3) the ratio of debt to equity of the corporation, (4) whether there is convertibility into the stock of the corporation, and (5) the relationship between holdings of stock in the corporation and holdings of the interest in question. No regulations under this provision are in effect. T.D. 7920, 1983-2 C.B. 69↩.
3. This case does not raise the frequently litigated question whether the transfer for property between corporations with common shareholders produces a constructive dividend to the shareholders. A constructive dividend may result if the transfer is used directly or indirectly for the benefit of the shareholders. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3d Cir. 1974); Gilbert v. Commissioner,74 T.C. 60, 64 (1980); Schwartz v. Commissioner,69 T.C. 877, 884 (1978); Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973); Rushing v. Commissioner,52 T.C. 888, 893 (1969), affd. on other issues 441 F.2d 593↩ (5th Cir. 1971); there is no evidence that the Vista-Terra transfer benefited Mrs. Glennon personally. Her only benefit was a derivative one of using Vista's assets to capitalize Terra.